No. 15-1828

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

B.E. TECHNOLOGY, L.L.C.,
Appellant,

v.

MICROSOFT CORPORATION, GOOGLE, INC.,
Appellees.

On Appeal From the United States Patent and Trademark Office
Before The Patent Trial and Appeal Board
Case IPR2014-00039
Case IPR2014-00738

## APPELLANT'S OPENING BRIEF

ROBERT E. FREITAS
DANIEL J. WEINBERG
FREITAS ANGELL & WEINBERG LLP
350 Marine Parkway, Suite 200
Redwood Shores, California 94065
Telephone:  (650) 593-6300
Facsimile:   (650) 593-6301

Attorneys for Appellant
B.E. Technology, L.L.C.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST.................................................................. 1

STATEMENT OF RELATED CASES....................................................... 2

JURISDICTIONAL STATEMENT ............................................................ 3

STATEMENT OF THE ISSUES ............................................................... 3

STATEMENT OF THE CASE ................................................................... 4

STATEMENT OF FACTS .......................................................................... 5

SUMMARY OF THE ARGUMENT ....................................................... 10

STANDARD OF REVIEW ...................................................................... 13

I.    MICROSOFT FAILED TO PROVE THAT GUYOT ANTICIPATES ANY OF THE CLAIMS OF THE '314 PATENT .......................................................... 14

    A.    Guyot Does Not Disclose Demographically-Targeted Advertising........... 14

        1.    Guyot Does Not Explicitly Disclose The Use Of Demographic Information .............................................. 15

        2.    The Use Of Demographic Information Is Not Inherent In Guyot .......................................................... 19

        3.    Expert Testimony Cannot Overcome the Patentee's Express Constructions ................................................... 23

    B.    Guyot Does Not Disclose Transferring A Copy Of The Software In Response To A Download Request By The User ...................................... 24

        1.    The Board's Construction Of "A Download Request By The User" Is Erroneous ........................................ 24

        2.    Guyot Fails To Disclose "A Download Request By The User." ............................................................. 27

    C.    Guyot Does Not Disclose "Providing A Unique Identifier To The Computer." ......................................... 30

1.    The Board's Construction Of "Providing A Unique Identifier To The Computer" Is Incorrect .......................................................... 30

2.    Guyot Does Not Teach Providing A Unique Identifier To The Computer ........................................................................................... 34

3.    Guyot Does Not Satisfy The "Unique Identifier" Limitation ......... 35

D.    Claims 12-22 Of The '314 Patent Are Patentable ...................................... 37

II.    THE BOARD SHOULD NOT HAVE DENIED B.E.'S MOTION TO AMEND ................................................................................................................ 40

A.    B.E.'s Motion to Amend Did Not Introduced Terms That Required Construction ................................................................................................. 40

B.    B.E.'s Written Description Support for its Amended Claim Was Adequate ....................................................................................................... 41

III.    THE BROADEST REASONABLE INTERPRETATION STANDARD SHOULD NOT APPLY IN INTER PARTES REVIEW PROCEEDINGS ......... 45

IV.    CONCLUSION ..................................................................................................... 47

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*CCS Fitness, Inc. v. Brunswick Corp.*,
   288 F.3d 1359 (Fed. Cir. 2002)..................................................................... 25

*Cooper Techs. Co. v. Dudas*,
   536 F.3d 1330 (Fed. Cir. 2008)..................................................................... 46

*In re Cortright*,
   165 F.3d 1353 (Fed. Cir. 1999)..................................................................... 32

*Haberman v. Gerber Prods. Co.*,
   236 Fed. Appx. 592 (Fed. Cir. 2007)............................................................. 19

*Inventio AG, v. Thyssenkrupp Elevator Ams. Corp.*,
   649 F.3d 1350 (Fed. Cir. 2011)..................................................................... 18

*In re Kahn*,
   441 F.3d 977 (Fed. Cir. 2006)....................................................................... 39

*Int'l Flavors & Fragrances Inc. v. The United States of America,
   As Represented By The Secretary Of Agriculture*,
   2014 WL 2120542 (May 20, 2014) .......................................................... 41, 42

*Lacavera v. Dudas*,
   441 F.3d 1380 (Fed. Cir. 2006)..................................................................... 46

*MEHL/Biophile Int'l Corp. v. Milgraum*,
   192 F.3d 1362 (Fed. Cir. 1999)..................................................................... 20

*Microsoft Corp. v. Proxyconn, Inc.*,
   789 F.3d 1292 (Fed. Cir. 2015)..................................................................... 32

*In re NTP, Inc.*,
   654 F.3d 1279 (Fed. Cir. 2011)..................................................................... 32

*Perreira v. Dep't of Health and Human Serv.*,
   33 F.3d 1375 (Fed. Cir. 1994)....................................................................... 19

*Perricone v. Medicis Pharm. Corp.*,
   432 F.3d 1368 (Fed. Cir. 2005).............................................................. 15, 19

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ................................................................ 31

*In re Skvorecz*,
   580 F.3d 1262 (Fed. Cir. 2009) ................................................................ 32

*In re Suitco Surface, Inc.*,
   603 F.3d 1255 (Fed. Cir. 2010) ................................................................ 32

*Tafas v. Doll*,
   559 F.3d 1345 (Fed. Cir. 2009) ................................................................ 46

*In re Translogic Tech., Inc.*,
   504 F.3d 1249 (Fed. Cir. 2007) ................................................................ 25

## Federal Statutes

35 U.S.C. § 2(b)(2) ......................................................................................... 46

35 U.S.C. § 2(b)(2)(A) .................................................................................... 46

35 U.S.C. § 316 .............................................................................................. 46

35 U.S.C. § 326 .............................................................................................. 46

## State Statutes

America Invents Act .......................................................................................... 47

## Regulations

37 C.F.R. § 42.65(a) ...................................................................................... 19

37 C.F.R. § 42.100(b) .................................................................................... 25

37 C.F.R. § 42.121(b) .................................................................................... 45

## Other Authorities

H.R. Rep. No. 112-98, pt. 1, at 46-47 ............................................................ 47

# CERTIFICATE OF INTEREST

Counsel for Appellant B.E. Technology, L.L.C. ("B.E.") certifies the following:

1.     The full name of every party or amicus represented by me is:

B.E. Technology, L.L.C.

2.     The name of the real party in interest represented by me is:

N/A

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Robert E. Freitas
Jason S. Angell
Daniel J. Weinberg
FREITAS ANGELL & WEINBERG LLP
350 Marine Parkway, Suite 200
Redwood Shores, CA 94065
Telephone: (650) 593-6300
Facsimile: (650) 593-6301
rfreitas@fawlaw.com
jangell@fawlaw.com
dweinberg@fawlaw.com

## STATEMENT OF RELATED CASES

U.S. Patent No. 6,628,314 ("'314 patent") is the subject to the following appeals pending before this Court: *B.E. Tech., L.L.C. v. Google, Inc., Match.com LLC., and People Media, Inc.*, No. 15-1827; *B.E. Tech., L.L.C. v. Facebook, Inc., Google, Inc., Match.com LLC, and People Media, Inc.*, No. 15-1829.

The '314 patent is also the subject to several district court cases, the related proceedings being: *B.E. Tech., L.L.C. v. Microsoft Corp.*, No. 2:12-cv-02829 JPM tmp (W.D. Tenn.); *B.E. Tech., L.L.C. v. Google, Inc.*, No. 2:12-cv-02830 JPM tmp (W.D. Tenn.); *B.E. Tech., L.L.C. v. Facebook, Inc.*, No. 2:12-cv-02769 JPM tmp (W.D. Tenn.); *B.E. Tech., L.L.C. v. LinkedIn Corp.*, No. 2:12-cv-02772 JMP tmp (W.D. Tenn.); *B.E. Tech., L.L.C. v. Groupon, Inc.*, No. 2:12-cv-02781 JPM tmp (W.D. Tenn.); *B.E. Tech., L.L.C. v. Pandora Media, Inc.*, No. 2:12-cv-02782 JPM tmp (W.D. Tenn.); *B.E. Tech., L.L.C. v. Twitter, Inc.*, No. 2:12-cv-02783 JPM tmp (W.D. Tenn.); *B.E. Tech., L.L.C. v. Apple, Inc.*, No. 2:12-cv-02831 JMP tmp (W.D. Tenn.); *B.E. Tech., L.L.C. v. People Media, Inc.*, No. 2:12-cv-02833 JPM tmp (W.D. Tenn.); *B.E. Tech., L.L.C. v. Match.com, LLC*, No. 2:12-cv-02834 JPM tmp (W. D. Tenn.).

B.E. is aware of no other related cases.

## JURISDICTIONAL STATEMENT

The Patent Trial and Appeal Board ("PTAB" or "Board") had jurisdiction over Microsoft Corporation's ("Microsoft") petition under 35 U.S.C. § 6. Microsoft filed a petition for *inter partes* review of U.S. Patent No. 6,628,314. A1167-1170.  The Board issued a final written decision on March 31, 2015.  A28. B.E. timely filed its notice of appeal on June 2, 2015.  35 U.S.C. § 329.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

Whether Microsoft proved Claims 11-14 and 16-19 of the '314 patent are anticipated by U.S. Patent No. 6,229,098 ("Guyot").

Whether Microsoft proved that Claims 20-22 of the '314 patent would have been obvious over the combination of Guyot and Deutsch, et al., *How to Use Anonymous FTP*, IAFA Working Group, 1-13 (May 1994) ("RFC 1635").

Whether the Patent Trial and Appeal Board abused its discretion by requiring construction of a term not reasonably subject to dispute and by imposing an improper written description standard in denying B.E.'s motion to amend.

Whether the use of the "broadest reasonable interpretation" standard for construing the claims of a patent subject to *inter partes* review is proper under 35 U.S.C. §§ 326 and 316.

## STATEMENT OF THE CASE

On October 25, 2013, Microsoft filed a corrected petition requesting *inter partes* review of Claims 11 through 22 of the '314 patent, alleging eight different anticipation and obviousness theories. A1167-1170. B.E. did not file a preliminary response to the petition. On April 9, 2014, the Board instituted *inter partes* review on three grounds:

On the theory that Claims 11-14 and 16-19 are anticipated by U.S. Patent No. 6,229,098 ("Guyot");

On the theory that Claim 15 would have been obvious over a combination of Guyot and U.S. Patent No. 5,918,014 ("Robinson"); and

On the theory that Claims 20-22 would have been obvious over a combination of Guyot and Deutsch, et al., *How to Use Anonymous FTP*, IAFA Working Group, 1-13 (May 1994) ("RFC 1635"). A1247.

After institution, Petitioner/Appellee Google, Inc. filed a petition and motion to join the proceeding. The joinder motion was granted.

B.E. filed a patent owner response, A1517, accompanied by the declaration of expert witness Neal Goldstein, A1551, and Microsoft replied, A1965. B.E. also filed a contingent motion to amend Claim 11 of the '314 patent. A1601. B.E.'s motion was opposed. A1984.

An oral hearing was held on December 10, 2014.  On March 31, 2015, the

Board issued a final written decision, in which it determined that the Microsoft had

shown by a preponderance of the evidence that Claims 11-22 of the '314 patent are

unpatentable on each of the grounds on which trial was instituted, and denied

B.E.'s contingent motion to amend for procedural reasons.  A27-28.

## STATEMENT OF FACTS

The '314 patent discloses a method of providing demographically-targeted

advertising to a computer user.  *See* A61, Claim 11 ("A method of providing

demographically-targeted advertising to a computer user, comprising the steps of: .

. . ."); A53 (5:8-10) ("In accordance with another aspect of the invention, a method

is provided for supplying demographically-targeted advertising to a computer

user.").  The patent recognized that the internet presents a vast new advertising

medium with "significant advantages for advertisers," including that

advertisements can be targeted "demographically or reactively."  A51 (1:44-50).

But acquiring information from consumers that could be used in specially targeting

advertising presented challenges due to privacy-related concerns.  Access to

demographic information and information about computer usage appeared more

likely. "[S]tudies have shown that while people are concerned about privacy issues,

and, in particular, do not wish to provide specific information that identifies them

(such as their name, address, or Social Security number), they generally do not

mind providing demographic information, nor do they mind monitoring of their computer usage as long as their usage is not associated with any specific information that could be used to identify them." A51 (2:41-48). There also were limits to the type of usage information that could be collected. *See* A52 (3:11-14) ("One of the disadvantages of prior art systems that acquire data regarding an end-user's computer usage is that they are generally limited to gathering information concerning only certain limited uses of the computer."); *id.* at 3:20-22 ("By limiting the reported data in this manner, it is difficult to develop accurate profiles for the individual users that are useful in targeting advertising."). The '314 patent claims an improvement over the prior art methods by providing an anonymous system that permits the targeting of advertising based upon collected demographic information, and provides for the collection of computer usage information, such as web sites accessed, and software applications run, by the user, and the association of that information with the demographic information using a unique identifier.

The method of independent Claim 11 includes several steps relating to the collection, storage, and usage of demographic information and computer usage information.

> 11. A method of providing demographically-targeted advertising to a computer user, comprising the steps of:

providing a server that is accessible via a computer network,

permitting a computer user to access said server via said computer network,

acquiring demographic information about the user, said demographic information including information specifically provided by the user in response to a request for said demographic information,

providing the user with download access to computer software that, when run on a computer, displays advertising content, records computer usage information concerning the user's utilization of the computer, and periodically requests additional advertising content,

transferring a copy of said software to the computer in response to a download request by the user,

providing a unique identifier to the computer, wherein said identifier uniquely identifies information sent over said computer network from the computer to said server,

associating said unique identifier with demographic information in a database,

selecting advertising content for transfer to the computer in accordance with the demographic information associated with said unique identifier;

transferring said advertising content from said server to the computer for display by said program,

periodically acquiring said unique identifier and said computer usage information recorded by said software from the computer via said computer network, and

associating said computer usage information with said demographic information using said unique identifier.

A61-62.

The Microsoft petition alleged, *inter alia*, that Claims 11-14 and 16-19 of the '314 patent are unpatentable as anticipated by Guyot.  A1169-70.  The petition also alleged that Claim 15 would have been obvious over the combination of Guyot and Robinson, and that Claims 20-22 of the '314 patent would have been obvious over the combination of Guyot and RFC 1635.  A1169-1170.  Guyot teaches a method for "targeting and distributing advertisements over a distributed information network, such as the Internet."  A4021 (1:56-58).  Robinson discloses a system for the display of advertising to users of an interactive communications medium.  A412 (1:12-13).  RFC 1635 provides information about how to use the File Transfer Protocol (FTP).  A968.

The Board instituted trial on each of the above grounds.  In its institution decision and final written decision, the Board, using the "broadest reasonable interpretation" standard, construed the claim term "demographic information" to mean "collected characteristic information about a user that does not identify a user."  A7-8.  The Board also construed the term "download request by the user" to mean "sending a request for downloading data from a user's computer to the server."  A8-9.  Without providing a detailed rationale, the Board construed the limitation of "providing a unique identifier to the computer, wherein said identifier uniquely identifies information sent over said computer network from the computer to said server" to mean "any system, process, or entity that provides a

unique identifier to the computer, where the unique identifier identifies any information that is sent over the computer network." A9-10.

The Board determined that Microsoft demonstrated by a preponderance of the evidence that Claims 11-14 and 16-19 are anticipated by Guyot, Claim 15 would have been obvious over the combination of Guyot and Robinson, and Claims 20-22 would have been obvious over Guyot and RFC 1635.

The Board also considered and rejected B.E's contingent motion to amend. A23-27. B.E's proposed substitute Claim 23 corresponded to original independent Claim 11 with the additional limitations that advertising content be selected for transfer to the computer in accordance with real-time and other computer usage information and demographic information associated with said unique identifier, and that the computer usage information comprise information about the user's interactions with said computer software displaying advertising content and at least one other program. A24-25. Proposed substitute Claims 24-34 corresponded to original dependent Claims12-22 and did not include any amendments other than being renumbered to depend from proposed substitute Claim 23. A25.

The Board did not make a substantive evaluation of the amendment. Instead, it denied the amendment on the basis that a proposed construction was not provided for new claim terms. The Board also held that B.E. did not provide

adequate, "readily discernible" written description support for proposed substitute

Claim 23.  A26-27.

## SUMMARY OF THE ARGUMENT

Microsoft failed to prove that Guyot anticipates Claims 11-14, 16-19 of the

'314 patent.  First, Guyot fails expressly or inherently to disclose a method of

providing demographically-targeted advertising to a computer user.  Guyot does

not use any form of the word "demographic," and it contains no information about

the questions used in its questionnaire that is used to create a personal profile.  The

Board was incorrect to assume that "demographic information" is solicited from

users or included in the personal profile.  The usage of demographic information is

not inherent to the system and method of Guyot.  The Board also ignored the clear

definitions in the '314 patent when it found that internet sites accessed by a

subscriber, i.e., a subscriber's browsing history, is "behavior characteristic"

information and meets the definition of "demographic information" and not

"computer usage information."  Second, the Board improperly construed the term

"download request by the user" by ignoring the plain and ordinary meaning of the

word "request" and the fact that Claim 11 requires that the user, not the client

computer, to make the download request.  Even with the Board's incorrect

construction, Guyot does not meet the limitation of a "download request by the

user."  Lastly, the Board erred in its construction of "providing a unique identifier

to the computer" by ignoring explicit guidance provided by the specification and construing the term unreasonably broad under general claim construction principles.  Even so, Guyot does not meet this limitation because it does not disclose that the "unique proprietary identifier" is "provided" to the computer by the server and the "user's identification" does not uniquely identify information sent from the computer.

The '314 patent is patentable because Guyot does not disclose all limitations of independent Claim 11.  Dependent Claims 12-22 are patentable for the same reasons that Claim 11 is patentable.  Because Microsoft failed to prove that one having ordinary skill in the art would have been motivated to combine Guyot and RFC 1635, Claims 20-22 are also patentable.

B.E. satisfied all of the procedural and substantive requirements for a motion to amend.  None of the new terms of substitute Claim 23 would reasonably be subject to dispute.  The terms identified by the Board as requiring construction do not require construction.

The Board applied an arbitrary standard in its determination that B.E. did not satisfy the written description requirement.  B.E. clearly identified the written description support for each proposed claim substitute, and it did so in a manner identical in form to that employed in the only case in which the Board had allowed an amendment as of the date on which B.E.'s motion was filed.  B.E.'s disclosure

of written description support was sufficient and presented in a manner compliant with 37 C.F.R. § 42.121(b).  The Board's apparent additional requirement that support be "readily discernible" is insufficiently precise to provide meaningful guidance, and further cannot be justified if it requires something more than the disclosure required to support a claim.  Given that the process of identifying written description support necessarily requires citation to the application, a patent owner can do no more than cite the language of the application.  There is only one legal standard that guides the determination of whether a claim finds support in the specification, and the Board exceeds its power when it imposes an additional burden on patent owners.

The approach taken by the Board in addressing B.E.'s motion to amend is especially disturbing in light of the Board's use of the "broadest reasonable interpretation" standard when assessing the patentability of the challenged claims. A principal justification for the use of this standard is the idea that a patent owner has the opportunity to amend claims during *inter partes* review.  A simple review of the available statistical information shows this not to be true.  The approach taken by the Board in this case further demonstrates the absence of a realistic opportunity for amendment.

The broadest reasonable interpretation standard should not apply in *inter partes* review proceedings.  A panel of this Court upheld the Board's use of the

broadest reasonable interpretation standard in *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268 (2-1 decision), *reh'g en banc denied*, 793 F.3d 1297 (Fed. Cir. 2015) (6-5 decision). B.E. wishes to preserve the right to challenge the Board's use of the broadest reasonable interpretation standard should *certiorari* be granted and *In re Cuozzo* overturned, or *Cuozzo* otherwise no longer govern *inter partes* reviews.

## STANDARD OF REVIEW

The Board's legal conclusions (including as to claim construction) and statutory interpretation are reviewed de novo. *Belkin International, Inc. v. Kappos*, 696 F.3d 1379, 1381 (Fed. Cir. 2012). A "clear error" standard applies in the review of subsidiary factual determinations made in the course of claim construction. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 835 (2015); *see In re Cuozzo*, 793 F.3d at 1279-80 (applying the *Teva* standard in reviewing an *inter partes* review decision). The Board's interpretation of PTO regulations is entitled to substantial deference, unless the interpretation is "plainly erroneous or inconsistent with the regulation." *In re Garner*, 508 F.3d 1376, 1378 (Fed. Cir. 2007). The Board's determination of anticipation is a question of fact reviewed for substantial evidence. *In re Morsa*, 713 F.3d 104, 109 (Fed. Cir. 2013). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). The Board's ultimate conclusion of obviousness is reviewed de novo and

the underlying factual findings for substantial evidence. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). The "existence of a reason for a person of ordinary skill to combine references" is a question of fact. *In re Constr. Equip. Co.*, 665 F.3d 1254, 1255 (Fed. Cir. 2011). Actions of the Board that are "arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law" will be set aside. *In re Sullivan*, 362 F.3d 1324, 1326 (Fed. Cir. 2004); 5 U.S.C. § 706(2)(A).

## I.    MICROSOFT FAILED TO PROVE THAT GUYOT ANTICIPATES ANY OF THE CLAIMS OF THE '314 PATENT.

### A.    Guyot Does Not Disclose Demographically-Targeted Advertising.

The '314 patent claims a method of providing demographically-targeted advertising. *See* A61, Claim 11 ("A method of providing demographically targeted advertising to a computer user, comprising the steps of: . . . ."); A52 (5:8-10) ("In accordance with another aspect of the invention, a method is provided for supplying demographically-targeted advertising to a computer user."). The method of independent Claim 11 includes several steps relating to the collection, storage, and usage of demographic information. *See* A61 (22:47-50) ("[A]cquiring demographic information about the user, said demographic information including information specifically provided by the user in response to a request for said demographic information[]"); *id.* at (22:63-64) ("[A]ssociating said unique identifier with demographic information in a database[]"); *id*. at (22:65-67)

("[S]electing advertising content for transfer to the computer in accordance with the demographic information associated with said unique identifier[]"); A62 (23:6-7) ("[A]ssociating said computer usage information with said demographic information using said unique identifier.").

The Board construed "demographic information" to mean "collected characteristic information about a user that does not identify the user." A7-8. The Board wrongly determined that Guyot satisfies these "demographic information" limitations. Guyot does not use the word "demographic," describe the nature of the information collected from the subscriber, or say anything to satisfy the strict limits on "express" or "inherent" disclosure needed to establish anticipation. *See, e.g.*, *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1369 (Fed. Cir. 2005). The Board's ultimate reliance on the disclosure of collected "behavior characteristic" information—in the form of information on "Internet sites accessed by a subscriber"—plainly is incorrect because information about Internet sites accessed by a subscriber is "computer usage information" not "demographic information."

### 1. Guyot Does Not Explicitly Disclose The Use Of Demographic Information.

Guyot discloses a database that includes Subscriber Data and Subscriber Statistics, where the Subscriber Data includes a subscriber's identification information, password, and the subscriber's personal profile that is used to target

specific advertisements to the subscriber.  A403 (3:55-61).  Nothing in the

Subscriber Data is demographic information such that the targeting of

advertisements is done in accordance with demographic information.

First, the "identification information" in Guyot's Subscriber Data plainly

does not meet the Board's definition of demographic information because

"identification information" identifies the subscriber.  A403 (3:55-61).  The

subscriber's identification information cannot be "collected characteristic

information about a user that does not identify the user."  Second, the subscriber's

password is not demographic information.  Guyot provides no disclosure about any

requirements for the password and there is no evidence that the password would

contain characteristic information about a user.  Accordingly, neither the

identification information nor the password of the Subscriber Data contains

demographic information such that Guyot could be said to target advertising based

on demographic information.

Turning to the personal profile, Guyot discloses that (1) the personal profile

is preferably obtained by having the subscriber provide answers to a questionnaire,

and (2) the profile is further defined by tracking "Internet sites that the subscriber

has accessed over a predetermined period of time."  A403 (3:61-63, 4:19-23).  But

none of this expressly involves demographic information.  Guyot does not list the

questions contained in the questionnaire or provide a basis for concluding that the

questions include a call for demographic information.  The existence of a

questionnaire, with nothing more, does not expressly disclose the collection of

demographic information about a user.

The Board found that "Internet sites accessed by a subscriber describe a

behavior characteristic of a user" and "[t]his collected behavior characteristic of

the user is within the broadest reasonable interpretation of 'demographic

information.'"  A14-15.  The Board's finding is wrong.  "Internet sites accessed by

a subscriber" is "computer usage information" not "demographic information.

There is a fundamental difference between demographic information and computer

usage information.  The '314 patent and the art presented to the Board recognize

the distinction.

The '314 patent describes a two-tiered system for targeting advertisements

that includes both "demographic information" and "computer usage information."

A54 (7:43-46) ("Periodically, computer usage information is sent to ADM server

22 for use in profiling the end user and better targeting future advertising to the end

user.").  The '314 patent defines "computer usage information" as, *inter alia*, "what

information resources [a person] access[es]."  A52 (3:37-41); *see also* A62 (24:3-

5) ("18.  The method of claim 11, wherein said computer usage information

includes data regarding information resources accessed by the user over the global

computer network.").  "Information resource" is defined as "[a] source of

information stored on a server or other computer that is accessible to other computers over a network." A52 (3:52-54). In other words, a website accessible over the internet is an information resource. According to the clear definitions in the '314 patent, information about internet sites accessed by a subscriber is "computer usage information" and cannot be made demographic information by affixing the "behavioral" label to it. *See Inventio AG, v. Thyssenkrupp Elevator Ams. Corp.*, 649 F.3d 1350, 1356-57 (Fed. Cir. 2011) ("[W]e allow an inventor to provide, in the written description, express definitions for terms that appear in the claims, and those definitions govern the construction of the claims.").

The '314 patent plainly distinguishes between "demographic information" and "computer usage information." *See* A61 (22:48) ("[A]cquiring demographic information about the user[]"); *id.* at 22:52-55 ("[P]roviding the user with download access to computer software that . . . records computer usage information concerning the user's utilization of the computer[]"); A62 (23:6-7) ("[A]ssociating said computer usage information with said demographic information using said unique identifier."). The Board erred when it held "[t]he Internet sites accessed by a subscriber describe a behavior characteristic of a user" that is "within the broadest reasonable interpretation of 'demographic information.'" The '314 patent makes clear that a user's internet browsing history is "computer usage information," not "demographic information."

Accordingly, nothing in Guyot's personal profile expressly involves the collection, storage, or usage of demographic information.

### 2. The Use Of Demographic Information Is Not Inherent In Guyot.

The Board did not conclude, Microsoft did not argue, and Dr. Houh did not suggest that the collection, storage and usage of demographic information is inherent to the system and method of Guyot. Anticipation requires a showing that each limitation of a claim is found in a single reference, either expressly or inherently. *Perricone*, 432 F.3d at 1369. Because Guyot does not expressly teach the use of "demographic information" in targeting advertisements, there could be no anticipation finding unless Guyot inherently teaches the use of demographic information. It does not.

An expert opinion consisting of conclusory statements not supported by any objective evidence or analysis is not persuasive. *See Perreira v. Dep't of Health and Human Serv.*, 33 F.3d 1375, 1377 n.6 (Fed. Cir. 1994) ("An expert opinion is no better than the soundness of the reasons supporting it."). Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight in PTAB proceedings. 37 C.F.R. § 42.65(a). To prove inherency, expert testimony must establish that the claimed characteristic is always present when practicing the teaching of the prior art reference. *See Haberman v. Gerber Prods. Co.*, 236 Fed. Appx. 592, 597 (Fed. Cir. 2007)

(finding expert testimony insufficient to demonstrate that the prior art necessarily functions in a manner within the scope of the claim). "Inherency, however, may not be established by probabilities or possibilities." *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999) (quoting *In re Oelrich*, 666 F.2d 578, 581 (CCPA 1981)). Inherency also cannot be established by expert pronouncements that are not supported by the actual content of a prior art reference.

Dr. Houh asserted that a person with ordinary skill in the art would have understood that information collected in response to the user profile questionnaire to create and update the user's personal profile is "demographic information," but there is no reason why he or she could have done so. *See* A267 (¶266); A270-271 (¶¶273-275); A272 (¶278); A279-280 (¶¶300-301). A person of ordinary skill could perhaps imagine that Guyot might use demographic information, but Guyot does not state that it does, and it would not be necessary that it do so in order for the Guyot system to perform its intended functions. One cannot "understand" that which is not shown to be so by the explicit content of the prior art or the inherent characteristics or requirements of a system or method disclosed in the prior art. Dr. Houh's statement that one of ordinary skill would have "understood" that the information of undisclosed nature in Guyot "is" demographic information is obviously not true. But that is what Dr. Houh asserts with his unexplained and

unsupported statement that all of the information employed in Guyot "is" demographic information.  Dr. Houh's conclusory pronouncement is of no more value than a statement that the information "is" a list of favorite English football players or inexpensive tropical vacation sites.

Why would a person having ordinary skill in the art "understand" that the information discussed in Guyot "is" demographic information?  Dr. Houh did not say, and the Board's acknowledgment of his statement adds nothing.  Dr. Houh's statement is conclusory, unsupported by any references to the actual disclosure of Guyot, and plainly inadequate to establish inherency under the settled law.  Neither Dr. Houh nor the Board explained how one of ordinary skill could be certain that the information used in the profile would necessarily include characteristic information that does not identify the user.

Microsoft made no serious attempt to establish that only demographic information could be used to target advertisements, and any gesture in this direction would have been futile.  There are various productive ways in which a personal profile could be built based upon answers to a questionnaire that would not involve demographic information.  For example, the questionnaire could seek a name, credit card number or email address.  *See e.g.*, A1440 (191:20-21) (recognizing that at least some information collected would "probably" be "personally identifiable").  The questionnaire might ask the user to identify

preferred websites.  Or the questions may seek the identification of a user's

favorite sports teams or the number of times the user travels overseas.  There are a

multitude of questions about the user's consuming habits that would be highly

desirable to advertisers and useful in formulating a targeted advertising system that

do not involve the disclosure of demographic information.  That is what the record

before the Board established, and the Board said nothing to alter the significance of

the evidence.

Nothing in Guyot provides one of ordinary skill in the art with a rationale for

concluding that the use of demographic information is inherent in the targeting of

advertisements in general, or in the Guyot system.  It was wrong for the Board

effectively to assume that the profile information would be characteristic

information about a user that does not identify the user.  The mere possibility that

demographic information might be the sort of information gathered is insufficient

to establish that demographic information is the only information that could be

used when practicing the teachings of Guyot.  This, rather than the relevant

inherency inquiry, seems the point of Dr. Houh's argument.  It simply is not true

that a person having ordinary skill in the art would "understand" that all of the

information that could conceivably be used to practice the invention of Guyot "is"

demographic information.  Dr. Houh's assertion to the contrary is a disguised

obviousness argument, swapping the thought that demographic information "could

be" used for the idea that no other information could be used. Regardless, trial was not instituted on section 103 grounds involving this claim and Guyot. The issue is whether Guyot anticipates the '314 patent. Because the use of demographic information is not disclosed in Guyot, it does not.

### 3.    Expert Testimony Cannot Overcome the Patentee's Express Constructions.

As captured in the '314 patent, demographic information is fundamentally different from computer usage information. *See supra*, I.A.1. It was thus incorrect for the Board to conclude that the behavioral information of a subscriber's internet browsing history is demographic information when it is clearly computer usage information. The Board's portrayal of browsing history as a "behavior characteristic" is irrelevant. *See* A14-15. There is no possible way that the Board could conclude that browsing history is within the "broadest reasonable interpretation" of "demographic information" when the '314 patent expressly defines it as "computer usage information."

As a last resort, Microsoft attempted to base its internet browsing behavior argument on isolated portions of the deposition transcript of B.E.'s expert, Mr. Goldstein. A1966-1967. What Mr. Goldstein said cannot change the definitions in the '314 patent—that browsing history is clearly "computer usage information." Regardless, Mr. Goldstein was consistent in his testimony when he identified browsing history as behavior, not a characteristic. *See* A1916-1918. In fact, Mr.

Goldstein stated that a user's browsing history would describe a ***behavior***, not a

characteristic.  A1918 (54:12).  It is clear from the transcript that Mr. Goldstein

consistently concluded that browsing history describes behavior.  Microsoft cannot

argue, and the Board could not have concluded, that Guyot's tracking of browsing

history is demographic information.

### B. Guyot Does Not Disclose Transferring A Copy Of The Software In Response To A Download Request By The User.

#### 1. The Board's Construction Of "A Download Request By The User" Is Erroneous.

Claim 11 of the '314 patent includes the step of "transferring a copy of [the]

software to the computer in response to a download request by the user."  A61

(22:57-58).  The Board incorrectly construed "a download request by the user" to

mean "sending a request for downloading data from a user's computer to the

server."  A9.

Partly as a result of an unnecessary dispute about whether a request requires

"intent," the Board lost focus on the fact that the "request" of Claim 11 is a request

"by the user."  Not any "request" from "a user's computer" is "a request by the

user," indisputably a human.  If it is necessary to include an "intent" requirement

to ensure that the request be "by the user," so be it, but no argument about the role

of intent can justify dispensing with the requirement that the request be "by the

user."  It is not enough that the intent originate "from a user's computer."  It must

be "by the user," and the Board was wrong to eliminate this limitation.

In *inter partes* review, as justified by *In re Cuozzo*, claim terms in an

unexpired patent are given their broadest reasonable interpretation in light of the

specification of the patent in which they appear.  793 F.3d at 1275-79; 37 C.F.R. §

42.100(b).  It is presumed that claim terms are given their ordinary and customary

meaning.  *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed.

Cir. 2002); *see also In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir.

2007) (finding that claim terms are given their ordinary and customary meaning, as

would be understood by one of ordinary skill in the art in the context of the entire

disclosure).  The plain and ordinary meaning of "request" is "to ask for

something."  "The user," in Claim 11 means "the person using the computer."

"The user" is not the computer.

Throughout Claim 11, the terms "computer" and "user" are used to refer to

distinct entities.  The preamble of the claim refers to the invention as "[a] method

of providing demographically-targeted advertising to a computer user . . . ."  A61

(22:42-43).  In the "permitting" limitation, it is a "computer user" who is

permitted, and the "acquiring" limitation refers to the acquisition of information

about the "user," who also provides information.  *Id*. at 22:46-51.  In the first

"providing" limitation, the "user" is provided download access to software.  *Id*. at

22:52-56.  In the second "providing" limitation, the unique identifier is provided to

the "computer," and it "uniquely identifies information sent . . . from the

computer."  *Id*. at 22:59-62.  Advertising content is selected for transfer to the

"computer."  *Id.* at 22:65.  Computer usage information is periodically acquired

from the "computer."  A62 (23:3-5).  In each case, there is a clear distinction

between the "computer" and the "user."  Thus, "download request by the user"

means that a *user* asks for a copy of software to be downloaded from a server to

the user's computer.

Consistent with the plain meaning of "request," and the fact that the human

makes the request, there is ample support in the specification of the '314 patent for

a construction requiring that the user to request the software download.  *See* A54

(8:58-59) ("[W]hen a user first accesses client application 10 for the ***purposes of

downloading*** and installing software, demographic data is obtained on the user . . .

.") (emphasis added).  Figure 8 of the patent shows a "process for providing access

to the client software application and for obtaining and utilizing demographic

information regarding the user."  A58 (16:54-56).  "As indicated at blocks 132 and

134, in response to server 22 receiving a download request from a user, the server

sends a form to the user and then waits for the completed form to be posted back to

the server." *Id*. at 16:60-63.  If the form is not completely filled out by the user

(block 136), the user will be requested to correct the form.  Only once the form is

completely filled out, does the server transmit the application to the client computer.  Because the process by which the software is requested for download involves the user completing a form, the user must be at least aware  of the request.

The Board improperly relied on Dr. Houh's unsupported conclusion that "all that is required is that a user take an action on the user's computer that sends a message to the server to which the server responds by downloading the software to the user's computer."  A2012-2013 (¶ 20).  The claim does not require that a user take "an[y] action," but that the user take the specific action of making a download request.  The claim does not broadly require transferring a copy of the software in response to "an action on the user's computer," but solely in response to "a download request by the user."

### 2.    Guyot Fails To Disclose "A Download Request By The User."

Guyot does not meet the limitation of a "download request by the user."  The download request asserted by Microsoft is not performed by the user, but by the client computer or even the server computer.  The Board even explained that in Guyot "the manual selection of the 'connection button,' by the subscriber, triggers the subscriber's *computer* to request the downloading of the latest software from the server."  A16 (emphasis added).  The Board, Microsoft, and B.E. all agree: Guyot discloses a download request by the computer, not the user—an important distinction that cannot be easily brushed aside.

As Dr. Houh states, Guyot merely "describes a routine in which the server system determines whether the user's computer needs new software and if so, the server transfers an updated version of the software to the client computer."  A281 (¶ 309).  Specifically, Guyot discloses the following routine:

> The "CONNECT TO SERVER" routine starts at step S500 and proceeds to step S520, where the control system determines if an automatic connection mode is enabled.  If so, control jumps directly to step S540. Otherwise, control continues to step S530.
>
> At step S530, the control system determines if a manual connection to the server has been authorized.  As described above, the subscriber can manually instigate a connection to the server 200 by selecting the connection button 550 in the client application window 500.  If the connection button 550 has been selected, control continues to step S540. Otherwise, control returns to step S1000 of the control routine shown in Fig. 5.
>
> At step S540, the control system establishes a connection to the server 200 over the communication link 400. Next, at step S550, the control system sends a LOCSOFT command to server 200 over the communication link 400.  The LOCSOFT command sent to the server 200 also includes information regarding the version of the client application software being run on the subscriber system 300.  Control then continues to step S560, where the server 200 executes the LOCSOFT routine, shown in Fig. 7, and sends information on the latest version of the client application software to the subscriber system 300.
>
> Next, at step S570, the control system determines if the latest version of the client application software needs to be downloaded based on the software version information sent form the server 200 at step S560. If the latest client application software needs to be downloaded, control continues to step S580.  Otherwise, control jumps

> directly to step S590. At step S580, the control system
> downloads the latest client application software by
> connecting to the Internet site on which the latest client
> application software is stored.

A405 (8:14-46). Microsoft contends that there is a request by the user to download

software within the meaning of Claim 11 because the user initiates the connection

to the server when the application is in manual connection mode. *See* A1453

(204:12-14) ("In manual mode, without the user clicking that button, it wouldn't

have occurred."). That is not what is described in Claim 11. Aside from clicking

connect, the user in no sense has asked for the software to be downloaded to his or

her computer. The subscriber is not making a request for a download, but is

making a request to connect.

Guyot does not disclose any message to the user that might convey that a

new version of the software is available prior to requesting the connection. To the

contrary, Guyot discloses that "[t]he application window 500 preferably includes . .

. a Subscriber Context state indicator 520," and that "[t]he Subscriber Context state

indicator 520 informs the subscriber of the need to connect to the server 200 in

order to update the advertisement queue and to upload the Subscriber Statistics to

the server 200." A404 (5:29-31, 5:38-42). "In a preferred embodiment, the color

of the context state indicator 520 changes to reflect the need to connect to the

server 200." *Id*. at 5:42-44. Thus, when the subscriber "selects th[e] [connection]

button in order to manually establish a connection with the server," *id*. at 6:44-46,

the subscriber understands only that subscriber statistics have to be uploaded, and that the advertisement queue must be updated. The subscriber has no information that would cause him or her to perceive even the potential that a new version of the software is available, let alone will be downloaded.

The subscriber is not even aware that "the control system determines if the latest version of the client application software needs to be downloaded." A1453 (204:4-9) ("[T]he user explicitly clicked a button. A user doesn't necessarily know what happens in the computer after it clicks a button, because the user doesn't know what the code does. So I don't see how—it just happens. The computer makes it happen."). This is not a request by the human user. *See* A1563 (¶¶ 35-37). Guyot fails to teach "transferring a copy of said software to the computer in response to a download request by the user," and Guyot therefore does not anticipate Claim 11 of the '314 patent.

### C. Guyot Does Not Disclose "Providing A Unique Identifier To The Computer."

#### 1. The Board's Construction Of "Providing A Unique Identifier To The Computer" Is Incorrect.

Claim 11 of the '314 patent includes the step of "providing a unique identifier to the computer, wherein said identifier uniquely identifies information sent over said computer network from the computer to said server." A61 (22:59-

62).  The Board erred in its construction of this term by ignoring explicit guidance provided by the specification and construing the term unreasonably broadly.

"Claims must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979.  "[T]he specification is 'always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  "It is therefore entirely appropriate . . . to rely heavily on the written description for guidance as to the meaning of the claims."  *Phillips*, 415 F.3d at 1317.  Here, guidance is provided by the specification in construing this term.  The '314 patent is explicit that the unique identifier be "provided" to the computer by the server.  In describing how a new account is created, the specification states that "[o]nce all required information has been provided, flow moves to block 164 where the application reports demographic data back to server 22, ***receives an assigned ID from the server***, and stores the new user data at the client computer in user data storage 34."  A59 (18:11-16) (emphasis added).

Although B.E. disputes the Board's use of the broadest reasonable interpretation standard, the Board construed the claim so broadly that its construction is unreasonable and should be rejected.  If the Board is to use the broadest reasonable interpretation standard, "[t]hat is not to say, however, that the

Board may construe claims during *inter partes* review so broadly that its

constructions are *unreasonable* under general claim construction principles.

*Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015).  "The

protocol of giving claims their broadest reasonable interpretation . . . does not

include giving claims a legally incorrect interpretation."  *In re Skvorecz*, 580 F.3d

1262, 1267 (Fed. Cir. 2009).  Even under the broadest reasonable interpretation,

the Board's construction "cannot be divorced from the specification and the record

evidence," *In re NTP, Inc.*, 654 F.3d 1279, 1288 (Fed. Cir. 2011), and "must be

consistent with the one that those skilled in the art would reach," *In re Cortright*,

165 F.3d 1353, 1358 (Fed. Cir. 1999).  A construction that is "unreasonably broad"

and which does not "reasonably reflect the plain language and disclosure" will not

pass muster.  *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010).

Here, the Board construed "providing a unique identifier to the computer"

and the "identifier uniquely identifies information sent over said computer

network" to mean "any system, process, or entity that provides a unique identifier

to the computer, where the unique identifier identifies any information that is sent

over the computer network."  A10.  Using the broadest reasonable standard

tempted the Board to improperly conclude that *any* system, process, or entity can

provide a unique identifier to the computer and that the identifier need only

identify *any* information sent over the network.  These overly broad constructions

have no support in the '314 patent or the record.  The Board stated that "[c]laim 11 does not limit the system, process, or entity that 'provides' the unique identifier." A10.  While the claim on its face does not limit the source of the unique identifier, the Board ignored what the specification specifically teaches—that the unique identifier is provided by the server—and the entire context of the '314 patent.  The '314 patent involves client-server networked systems.  A54 (8:32-35) ("Referring now to FIG. 3, ADM server 22 is accessible via the Internet by any of a number of remotely located client computers 40 on which client software application 10 is installed.); A51 (1:20-24) ("The continuing expansion of the Internet and other private and semi-private networks has led to the now widespread practice of electronic distribution of software to end users, whether as freeware, shareware, or fully paid-up licensed software.").  It was incorrect to find that any system, process, or entity can provide a unique identifier, such as snail-mail or a phone system, to the computer because it ignores the specific technical context to the '314 patent relates.  The specification provides additional guidance specific to this point and should not be overlooked.  The Board's construction is unreasonably broad because it is unsupported, divorced from the specification, and does not reasonably reflect the plain language of the disclosure.

## 2.    Guyot Does Not Teach Providing A Unique Identifier To The Computer.

Neither of the potential identifiers in Guyot meets the claim limitation in the '314 patent because Guyot does not disclose that the "unique proprietary identifier" is "provided" to the computer by the server and the "user's identification" identifies the user and does not uniquely identify information sent from the computer.

The Board's institution decision recognizes that in Guyot, "[e]ach subscriber system has a unique proprietary identifier."  A1237; A403 (3:21-22).  Guyot does not disclose that the identifier is "provided" to the computer.  *See* A403 (3:18-22) ("In a preferred embodiment, the distributed information network 100 is implemented on the Internet, with the server 200 and each of the subscriber system 300 having a unique proprietary identifier.").

The '314 patent, on the other hand, is explicit that the unique identifier be "provided" to the computer by the server.  *See supra* I.C.1.  A person of ordinary skill in the art would understand many ways in which a unique identifier might be associated with a given subscriber system, including for example a MAC address.  A1566 (¶ 41).  Accordingly, in the absence of some disclosure regarding how the "unique proprietary identifier" became assigned to the subscriber system, Guyot fails to anticipate this limitation of Claim 11.

### 3.    Guyot Does Not Satisfy The "Unique Identifier" Limitation.

Claim 11 requires a "unique identifier" that "uniquely identifies information sent over said computer network from the computer to said server." A61 (22:60-62). Microsoft argued that Guyot shows a unique identifier in the form of the "user's identification, password, and personal profile" included in the Subscriber Data. A1193; s*ee also* A403 (3:57-60) ("The Subscriber Data preferably includes, for each subscriber, the subscriber's identification information, a password assigned to the subscriber, and a personal profile of the subscriber . . . ."). The Subscriber Data admittedly identifies the subscriber, and thus is not a likely candidate for "unique" identification of information sent from the computer. For the obvious reason that multiple users could share a computer, the Subscriber Data are incapable of "uniquely" identifying information sent from the computer.

To obscure the failure of its selected identifier to satisfy the "uniquely" requirement, Microsoft attempted a red herring response in which it accused B.E. of claiming that the identifier must identify the computer. Unlike Microsoft and the Board, however, B.E. never strayed from the requirement that the identifier uniquely identify information sent from the computer. The identifier need not specifically and only identify the computer, but that is the most likely way an identifier might "uniquely" identify the information sent from the computer.

Regardless of how an identifier might meet the limitation, the Subscriber Data do not.  The Subscriber Data include an individual subscriber password, and it would be apparent to one of ordinary skill in the art that the Subscriber Data would not uniquely identify the information sent from the computer to the server because multiple subscribers may utilize the client application.  A1567 (¶ 44).

Moreover, the '314 patent discloses that the unique identifier is used to "anonymously identify the user."  A59 (17:29-30).  The Subscriber Data of Guyot include "the subscriber's identification information" which, far from anonymously identifying the user, identifies the user by definition.  The '314 patent recognized the importance of providing anonymity to users as a trade-off for effectively collecting demographic information and monitoring computer usage information.  A51 (2:41-48).

> ("[S]tudies have shown that while people are concerned about privacy issues and, in particular, do not wish to provide specific information that identifies them (such as their name, address, or Social Security number), they generally do not mind providing demographic information, nor do they mind monitoring of their computer usage as long as their usage is not associated with any specific information that could be used to identify them.").

*Id.*  The Subscriber Data cannot fulfill this role.

### D.    Claims 12-22 Of The '314 Patent Are Patentable.

The '314 patent is patentable because Guyot does not disclose all limitations of independent Claim 11.  Claims 12-22 are also patentable for the same reasons that Claim 11 is patentable.  Specifically, Claims 20-22 are patentable over the proposed combination of Guyot and RFC 1635.

Microsoft failed to prove the existence of a motivation to combine Guyot and RFC1635.  Claim 20 of the '314 patent claims "[t]he method of claim 11, wherein said acquiring step further comprises requesting said demographic information in response to a request from the user to download said software and receiving said demographic information from the user prior to providing the user with access to said software."  A62 (24:9-14).  Microsoft conceded that Guyot "does not state that the step of downloading the client application (or a new version of the client application) must occur only before or only after answers are provided by a user to build or update the user's personal profile."  A1202.  As a consequence, Microsoft sought to combine Guyot with RFC1635, which "provides information for the novice Internet user about using the File Transfer Protocol (FTP)."  A968.

RFC 1635 discloses that FTP is a protocol used on the Internet to transfer files from one computer (host) on the Internet to another.  A968.  A user of an FTP program must log into both hosts using an account and password in order to

transfer a file from one host to the other. *Id.* RFC 1635 also describes the use of

anonymous FTP where a special user account called "anonymous" is created and

used. A969.

The Board erred in finding that a person having ordinary skill in the art

would have found it to be an obvious design choice to combine the feature of RFC

1635 for prompting a user for information prior to providing download access with

Guyot. One having ordinary skill in the art, when seeking a solution to obtaining

answers to a user questionnaire, would not consider the FTP protocol. A1569

(¶48). Microsoft stated that "performing steps in the order specified by claim 20 . .

. was conventional and indeed the typical sequence followed by client-server

systems, such as FTP servers in the anonymous FTP process illustrated in, for

example, Ex. 1022 (RFC 1635)." A1202-1203. But anonymous FTP has limited

features. *See* A969 ("[T]he only operations allowed are logging in using FTP,

listing the contents of a limited set of directories, and retrieving files."). One

having ordinary skill in the art interested in designing a system to induce users to

provide demographic information would not be concerned with how to permit files

to be retrieved. The person would be looking in another direction entirely, toward

systems that involve the collection of demographic information, not anonymous

access to FTP sites. The limited operations of anonymous FTP also would not

attract a person having ordinary skill in the art because it offers none of the

components needed to provide a substantive questionnaire or incorporate answers to the questionnaire into the system disclosed in Guyot.  A1569-1570 (¶¶ 48-51).

Microsoft failed to set forth sufficient evidence to support a finding of obviousness, and the Board should not have given weight to Dr. Houh's conclusory statements.  "Rejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006).  Dr. Houh states "I believe a person of ordinary [sic] also could have readily configured the Guyot systems to function in this manner based on the guidance in Guyot and their knowledge of Internet-based client-server techniques."  A297 (¶ 368).  But this rationale overlooks the objectives of the person of ordinary skill in the art in designing a system to collect information using a questionnaire.  Microsoft's sole evidence on this point, the conclusory statement by Dr. Houh, is thus insufficient to prove obviousness and the motivation to combine Guyot and RFC 1635.  Therefore, Claims 20-22 of the '314 patent are patentable.

## II.   THE BOARD SHOULD NOT HAVE DENIED B.E.'S MOTION TO AMEND

### A.   B.E.'s Motion to Amend Did Not Introduced Terms That Required Construction

B.E. distinguished its substitute Claim 23 from all of the cited prior art by adding the elements "wherein the computer usage information comprises information about the user's interactions with said computer software displaying advertising content and at least one other program" and selecting advertising content in accordance with "real-time and other computer usage information and demographic information associated with said unique identifier, and transferring said advertising content from said server to the computer for display by said program."  A1602.

The Board found that B.E.'s Motion to Amend failed to provide claim constructions for the new terms its amendment added.  A26.  The lone example provided by the Board, however, did not require construction.  Instead the Board's discussion injected confusion into the interpretation of a readily understandable claim limitation.  For the limitation "selecting advertising content for transfer to the computer in accordance with real-time and other computer usage information and demographic information . . ." the Board asserts that it is unclear "whether the 'selecting' or 'transfer' is in accordance with 'real-time.'"  *Id.*  The only thing unclear about this limitation is how the Board could parse the phrase "selecting

advertising content for transfer" in a manner that severs the word "transfer" from the verb it is obviously modifying.

The limitation "selecting advertising content for transfer to the computer in accordance with real-time . . . information" is further explained by the numerous citations to the original disclosure contained in B.E.'s Motion to Amend.  *See* A1606-1607.  These citations, detailed more fully below, reveal a consistent application of the term "real-time," which, when read in context, evince a term that could not reasonably need construction or be subject to dispute.

### B.    B.E.'s Written Description Support for its Amended Claim Was Adequate

The Board also erred in finding that the written description requirement was not met because B.E. did not clearly identify written description support for each proposed claim substitute.  B.E. filed its motion to amend on July 9, 2014 and its reply to Google's opposition on October 10, 2014.  At the time, the only motion to amend that the Board had granted was submitted by the U.S. Government in *Int'l Flavors & Fragrances Inc. v.  The United States of America, As Represented By The Secretary Of Agriculture*, IPR2013-00124, 2014 WL 2120542 (May 20, 2014).  The U.S. Government provided written description support in the following paragraph, reproduced from the Government's motion in full below:

### III. SUPPORT FOR CLAIMED SUBJECT MATTER

Each of the proposed claims finds support in "the original disclosure of the patent" (U.S. App. Ser. No. 12/106,505 (the '505 application), which issued as U.S. Pat. No. 7,579,016). See 37 C.F.R. §§42.121(b)(1)-(2). Support for each of the proposed claims and/or the additional elements of the proposed claims is provided below with reference to the as-filed version of the application. The as-filed version of the '016 application is submitted herewith as **Exhibit 1**.

Support for proposed substitute claim 27 can be found in at least ¶¶ 0071 and 0078-0083. Support for proposed substitute claims 28-44 can be found in at least ¶ 0085. Support for proposed substitute claim 41 can also be found in at least ¶ 0031. Support for proposed substitute claim 42 can also be found in at least ¶ 0052. Support for proposed substitute claims 43-44 can also be found in at least ¶ 0036. Support for proposed substitute claim 45 can be found in at least ¶¶ 0071 and 0036.

Mot. to Amend at *8, *Int'l Flavors & Fragrances Inc. v. The United States of America*, *As Represented By The Secretary Of Agriculture*, IPR2013-00124, (May 20, 2014), 2014 WL 2120542.

Based on this description, the Board "conclude[ed] that Patent Owner has made a sufficient showing that each of proposed independent claims 27 and 45, as well as each of proposed dependent claims 28-44, as a whole, has written description support in the application as filed." *Int'l Flavors & Fragrances Inc. v. The United States of America, As Represented By The Secretary Of Agriculture*, IPR2013-00124, 2014 WL 2120542, at *5 (May 20, 2014).

Seeking to emulate the U.S. Government's successful motion, B.E. modeled

its motion after the Government's motion.  B.E.'s equivalent "Support For

Claimed Subject Matter" paragraph is reproduced in full below:

> IV. SUPPORT FOR CLAIMED SUBJECT MATTER.
>
> Each of the proposed claims finds support in "the original disclosure of the patent" (U.S. Application Serial No. 09/699,705 (the '705 application), which issued as U.S. Patent No. 6,628,314). *See* 37 C.F.R. §§ 42.121(b)(1)-(2). Support for each of the proposed claims and/or the additional elements of the proposed claims is provided below with reference to the as-filed version of the application. The as-filed version of the '705 application is submitted herewith as Exhibit 2004.
>
> The as-filed version of the '705 application is submitted herewith as Exhibit 2004.  Support for proposed substitute claim 23 can be found in at least original claim 11, as well as the Abstract; page 4, lines 21-28; page 5, lines 6-7; page 8, lines 13-27; page 9; page 10, lines 1-13; page 11, lines 18-20; page 13, lines 18-22; page 14, lines 16-25; page 15, lines 7-26; page 17, lines 12-13; page 20, lines 19-28; page 21, lines 1-2 and 20-28; and pages 25-28.

A1580-1581.

The Board found that B.E.'s citations "fail[ed] to point out with any

particularity or explanation as to where in the several cited passages the additional

limitations are supported."  A27.  This finding is especially perplexing considering

that the primary distinction between the Government's support and B.E.'s support

is that B.E.'s citations offer more particularity than the Government's, not less.

Rather than cite full paragraphs, like the Government, B.E. delineated most of its support down to the line.[1]

To illustrate B.E.'s deficient support, the Board explained that it was "unable to discern readily where support for" the limitation "selecting advertising content for transfer to the computer in accordance with real-time" was located.  If, however, the Board had simply read the Abstract, it would have learned that "[t]he software application further targets the advertisements in response to normal user interaction, or use, of the computer . . . This provides two-tiered, real-time targeting of advertising – both demographically and reactively."  Similarly, if the Board had read Page 10 lines 1-13, it would have discovered that "identifiers permit real time, reactively-targeted advertising since the program can respond to user interaction with the computer to determine whether the input relates to a particular category of information, and, if so, can select advertising related to that category of information."

---

[1]   B.E., like the U.S. Government, relied upon the Board to visit the citations it provided.  At the time of filing, motions to amend were limited to15 pages.  Providing detailed explanation or quoting the support cited was impossible given the space constraints.  In recognition of trade-offs the page limit was forcing movants to make, on May 19, 2015 the U.S. Patent and Trademark Office increased the limit to 25 pages, and allowed the movant to include the claim listing in an appendix, rather than the body of the motion, so that it did not count against the limit.  Amendments to the Rules of Practice for Trials Before the Patent Trial and Appeal Board, 80 FR 28561-01, 28562 Federal Register, Vol. 80, No. 96,  (Tuesday, May 19, 2015).

The regulations governing motions to amend require that the motion "set forth: (1) The support in the original disclosure of the patent for each claim that is added or amended; and (2) The support in an earlier-filed disclosure for each claim for which benefit of the filing date of the earlier filed disclosure is sought. 37 C.F.R. § 42.121(b). B.E. satisfied both requirements in a manner that exceeded what the Board had previously found sufficient. A simple reading of the cited material demonstrates unambiguously that the amended claims are adequately supported. The Board's cursory finding to the contrary is clearly erroneous.

B.E's motion to amend should be granted or at the very least remanded to the Board for consideration on the merits.

## III.   THE BROADEST REASONABLE INTERPRETATION STANDARD SHOULD NOT APPLY IN *INTER PARTES* REVIEW PROCEEDINGS.

B.E. recognizes that this Court upheld the Board's use of the "broadest reasonable interpretation" ("BRI") standard in *In re Cuozzo*, F.3d at 1278, and that that decision is binding on this panel unless overturned by the *en banc* Court or the Supreme Court. B.E. reserves the right to challenge the Board's use of this standard if the Court affirms the Board's construction of the disputed terms discussed herein.

Should *In re Cuozzo* be overturned during the pendency of this appeal, B.E. submits that the BRI standard should not apply in *inter partes* review proceedings,

and requests that claim construction be carried out in a manner consistent with the rules that would be applied in B.E.'s infringement actions against Microsoft, Google, and others in the United States District Court for the Western District of Tennessee.

B.E. argued in the proceeding below that the adoption of the BRI standard exceeds the PTO's limited rule making authority. It is settled that the office has no substantive rule making authority. *Cooper Techs. Co. v. Dudas*, 536 F.3d 1330, 1336 (Fed. Cir. 2008); *see also Lacavera v. Dudas*, 441 F.3d 1380, 1383 (Fed. Cir. 2006). The adoption of the BRI standard was substantive because it can affect the meaning of the claims and ultimately the validity of the patent. The Board has acknowledged that there is no dispute that "[p]rior to the AIA, 35 U.S.C. § 2(b)(2) was said to be the 'broadest of the Office's rulemaking powers,'" and those powers were limited to the promulgation of procedural rules.

The argument that 35 U.S.C. §§ 326 and 316 granted new rule making authority has no merit. Both of these sections refer to "conduct" of, respectively, *inter partes* reviews and post grant reviews. The use of the word "conduct" does not signify "substance." The language of the statute is consistent with language of 35 U.S.C. 2(b)(2)(A) allowing the PTO to govern the "conduct" of proceedings in the Office. The Federal Circuit has recognized that this language confers no substantive authority. *Tafas v. Doll*, 559 F.3d 1345, 1352 (Fed. Cir. 2009), *vacated*

*and reh'g en banc granted*, 328 F. App'x 658 (Fed. Cir. 2009), *stayed*, 331 F. App'x 748 (Fed. Cir. 2009).  Nothing contained in either section 316 or 326 confers substantive rule-making authority.

*Inter partes* reviews were intended by Congress to provide an adjudicative alternative to the determination of patent validity.  "The Act ***converts inter partes reexamination from an examinational to an adjudicative proceeding***, and renames the proceeding '*inter partes* review.'"  H.R. Rep. No. 112-98, pt. 1, at 46-47 (emphasis added).  In an *inter partes* review, the patent owner does not have the right to amend claims that existed during examination and reexamination.  Under these circumstances, application of the BRI standard is not consistent with the letter or spirit of the America Invents Act.

## IV.    CONCLUSION.

For the foregoing reasons, the Court should reverse the PTAB's final written decision finding that Claims 11-22 of the '314 patent are unpatentable.  The Court should also reverse and remand for reconsideration of B.E.'s motion to amend the claims.

Respectfully submitted,

Dated:  September 28, 2015                  */s/Robert E. Freitas*
                                            Robert E. Freitas

# CERTIFICATE OF SERVICE

It is certified that copies of the foregoing have been served via electronic

transmission to the persons at the address below:

Jeffrey P. Kushan
Ryan C. Morris
Scott M. Border
Samuel A. Dillon
SIDLEY AUSTIN LLP
jkushan@sidley.com
rmorris@sidley.com
sborder@sidley.com
samuel.dillon@sidley.com

Brian A. Rosenthal
Clinton H. Brannon
Andrew J. Pincus
MAYER BROWN LLP
brosenthal@mayerbrown.com
cbrannon@mayerbrown.com
apincus@mayerbrown.com

Date:  September 28, 2015                    */s/Robert E. Freitas*
                                             Robert E. Freitas

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that

the Appellant's Opening Brief is proportionally spaced, in a typeface of 14 points

or more and contains 10,376 words, exclusive of those materials not required to be

counted under Rule 32(a)(7)(B)(iii).

*/s/Robert E. Freitas*
Robert E. Freitas

## ADDENDUM

Final Written Decision dated March 31, 2015

U.S. Patent No. 6,628,31

Trials@uspto.gov
Tel: 571-272-7822

Paper 43
Entered: March 31, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

MICROSOFT CORPORATION and GOOGLE, INC.,
Petitioner,

v.

B.E. TECHNOLOGY, LLC,
Patent Owner.

_____

Case IPR2014–00039
Case IPR2014–00738
Patent 6,628,314

_____

Before SALLY C. MEDLEY, KALYAN K. DESHPANDE, and
LYNNE E. PETTIGREW, *Administrative Patent Judges*.


DESHPANDE, *Administrative Patent Judge*.


FINAL WRITTEN DECISION
*35 U.S.C. § 318(a); 37 C.F.R. § 42.73*

IPR2014–00039
IPR2014–00738
Patent 6,628,314

## I.    INTRODUCTION

### A. Background

Microsoft Corporation ("Microsoft") filed a corrected Petition to institute *inter partes* review of claims 11–22 of U.S. Patent No. 6,628,314 (Ex. 1001, "the '314 patent").  Paper 5 ("Pet.").  B.E. Technology, LLC ("Patent Owner") did not file a preliminary response.  Pursuant to 35 U.S.C. § 314, we instituted *inter partes* review on April 9, 2014, as to claims 11–22 of the '314 patent—claims 11–14 and 16–19 under 35 U.S.C. § 102 as anticipated by Guyot,[1] claim 15 under 35 U.S.C. § 103 as obvious over Guyot and Robinson,[2] and claims 20–22 under 35 U.S.C. § 103 as obvious over Guyot and RFC 1635.[3]  Paper 13 ("Dec.").

After institution of the *inter partes* review, Google, Inc. ("Google") filed a Petition and a Motion to Join the *inter partes* review.  IPR2014-00738, Papers 1, 3. We granted the motion and joined Google and Microsoft (collectively, "Petitioner") in the *inter partes* review.  Paper 27.

Patent Owner filed a Response (Paper 30, "PO Resp.") and Petitioner filed a Reply (Paper 33, "Pet. Reply").  Patent Owner filed a Motion to Amend (Paper 31, "Mot. to Amend"), Petitioner filed an Opposition to Patent Owner's Motion to Amend, and Patent Owner filed a Reply to Petitioner's Opposition.

Oral hearing was held on December 10, 2014, and the hearing transcript has been entered in the record as Paper 42 ("Tr.").

The Board has jurisdiction under 35 U.S.C. § 6(c).  This final written decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the

---

[1] U.S. Patent No. 6,119,098 (Ex. 1006) ("Guyot").
[2] U.S. Patent No. 5,918,014 (Ex. 1007) ("Robinson").
[3] Deutsch et al., *How to Use Anonymous FTP*, IAFA Working Group, 1-13 (May 1994) (Ex. 1022) ("RFC 1635").

IPR2014–00039
IPR2014–00738
Patent 6,628,314

reasons discussed below, we determine that Petitioner has shown by a preponderance of the evidence that claims 11–22 of the '314 patent are unpatentable. Patent Owner's contingent Motion to Amend is *denied*.

### B. Related Proceedings

Petitioner indicates that the '314 patent is the subject of several district court cases: *B.E. Technology, L.L.C. v. Microsoft Corp.*, No. 2:12-cv-02829-JPM (W.D. Tenn.), where Petitioner was served on October 10, 2012, and *B.E. Technology, L.L.C. v. Google, Inc.*, No. 2:12-cv-2830-JPM (W.D. Tenn.), filed on October 9, 2012. Pet. 4–5; IPR2014-00738, Paper 1, 2–3.

The '314 patent is also the subject of *Google, Inc. v. B.E. Technology, L.L.C.*, IPR2014-00038 (PTAB Apr. 9, 2014), *Facebook, Inc. v. B.E. Technology, L.L.C.*, IPR2014-00052 (PTAB Apr. 9, 2014), *Facebook, Inc. v. B.E. Technology, L.L.C.*, IPR2014-00053 (PTAB Apr. 9, 2014), *Match.com LLC and People Media, Inc. v. B.E. Technology, L.L.C.*, IPR2014-00698 (PTAB June 13, 2014), *Match.com LLC v. B.E. Technology, L.L.C.*, IPR2014-00699 (PTAB June 13, 2014), *Google, Inc. v. B.E. Technology, L.L.C.*, IPR2014-00738 (PTAB June 18, 2014), *Google, Inc. v. B.E. Technology, L.L.C.*, IPR2014-00743 (PTAB June 18, 2014), and *Google, Inc. v. B.E. Technology, L.L.C.*, IPR2014-00744 (PTAB June 18, 2014). IPR2014-00699 has been joined with IPR2014-00038, IPR2014-00743 has been joined with IPR2014-00052, and IPR2014-00698 and IPR2014-00744 have been joined with IPR2014-00053.

### C. The '314 Patent

The '314 patent relates to user interfaces that provide advertising obtained over a global computer network. Ex. 1001, col. 1, ll. 12–16. The '314 patent discloses a client software application that comprises a graphical user interface

(GUI) program module and an advertising and data management (ADM) module. *Id.* at col. 6, ll. 64–67. The GUI comprises multiple regions, including a first region comprising a number of user selectable items and a second region comprising an information display region, such as banner advertisements. *Id.* at col. 4, ll. 24–37. Program modules associated with the GUI store statistical data regarding the display of the selected informational data, allowing the targeting of banner advertisements based upon the type of link selected by the user. *Id.* at col. 4, ll. 43–51. The system for selecting and providing advertisements is set forth in Figure 3 as follows:



FIG. 3

Figure 3 illustrates a block diagram of a system distributing advertisements over the Internet. *Id.* at col. 6, ll. 21–22. ADM server 22 is accessible by client computers 40 over Internet 20, where client computers 40 have the client software application installed. *Id.* at col. 8, ll. 32–35. ADM server has associated with it

IPR2014–00039
IPR2014–00738
Patent 6,628,314

Ad Database 44 and User/Demographics Database 46. *Id.* at col. 8, ll. 38–43. Ad

Database 44 stores banner advertising that is provided to client computers 40. *Id.*

User/Demographics Database 46 stores demographic information used in targeting

advertising downloaded to individual client computers 40. *Id.* at col. 8, ll. 55–57.

When a user first accesses the client software application for the purposes of

downloading and installing the application, the user submits demographic

information that is used to determine what advertising is provided to the user. *Id.*

at col. 8, ll. 57–62. The demographic information is submitted by the user by

entering the information into a form provided to the user, and ADM server 22

checks the completeness of the form. *Id.* at col. 16, l. 60 – col. 17, l. 2. ADM

server 22 then assigns a unique ID to the user and stores the unique ID with the

received user demographic information. *Id.* at col. 17, ll. 11–15. An initial set of

advertisements is selected, and the client software application is downloaded to

client computer 40 for installation. *Id.* at col. 17, ll. 17–23. The client software

application monitors user interaction with the computer, whether with the client

software application or with other applications, and later reports this information to

the ADM server. *Id.* at col. 12, ll. 55–59, col. 13, ll. 1–2. Advertising banners are

displayed in response to some user input or periodically at timed intervals. *Id.* at

col. 14, ll. 40–43. The client software application targets the banner advertising

displayed, based on the user's inputs, so that it relates to what the user is doing. *Id.*

at col. 14, ll. 43–46.

   *D. Illustrative Claims*

   Petitioner challenges claims 11–22 of the '314 patent. Independent claim 11

and dependent claims 15 and 20 are illustrative of the claims at issue and follow:

      11. A method of providing demographically-targeted
   advertising to a computer user, comprising the steps of:

providing a server that is accessible via a computer network,

permitting a computer user to access said server via said computer network,

acquiring demographic information about the user, said demographic information including information specifically provided by the user in response to a request for said demographic information,

providing the user with download access to computer software that, when run on a computer, displays advertising content, records computer usage information concerning the user's utilization of the computer, and periodically requests additional advertising content,

transferring a copy of said software to the computer in response to a download request by the user,

providing a unique identifier to the computer, wherein said identifier uniquely identifies information sent over said computer network from the computer to said server,

associating said unique identifier with demographic information in a database,

selecting advertising content for transfer to the computer in accordance with the demographic information associated with said unique identifier;

transferring said advertising content from said server to the computer for display by said program,

periodically acquiring said unique identifier and said computer usage information recorded by said software from the computer via said computer network, and

associating said computer usage information with said demographic information using said unique identifier.

15.    The method of claim 11, wherein said providing a unique identifier step further comprises storing a cookie on the computer.

20.    The method of claim 11, wherein said acquiring step further comprises requesting said demographic information in response to a request from the user to download said software and receiving said demographic information from the user prior to providing the user with access to said software.

IPR2014–00039
IPR2014–00738
Patent 6,628,314

*E. Claim Construction*

The Board will interpret claims of an unexpired patent using the broadest reasonable construction in light of the specification of the patent in which they appear. *See* 37 C.F.R. § 42.100(b); *see also In re Cuozzo Speed Techs., LLC*, No. 2014-1301, 2015 WL 448667, at *7–8 (Fed. Cir. Feb. 4, 2015) ("Congress implicitly adopted the broadest reasonable interpretation standard in enacting the AIA," and "the standard was properly adopted by PTO regulation."). Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech. Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

*1. "demographic information"*

Petitioner proposes that the term "demographic information" means "*information collected about end user characteristics that does not identify the end user.*" Pet. 10 (citing Ex. 1003 ¶¶ 105–106). Petitioner points to the context of "demographic information" as used in the '314 patent specification to include time zone, locale, and client hardware. *Id.* (citing Ex. 1001, col. 3, ll. 8–11). Petitioner further argues that the '314 patent specification specifically describes "demographic information" to exclude information that identifies an end-user for privacy concerns. *Id.* (citing Ex. 1001, col. 2, ll. 40–48). Patent Owner has not provided a construction for "demographic information," and Patent Owner agrees with this claim construction proposed by Petitioner. Tr. 23:1–6. We agree that Petitioner's proposed meaning for "demographic information" is both reasonable and consistent with its usage in the '314 patent specification. Accordingly, we

IPR2014–00039
IPR2014–00738
Patent 6,628,314

construe "demographic information" to mean "collected characteristic information about a user that does not identify the user."

### 2. *"download request by the user"*

Patent Owner proposes that the plain and ordinary meaning of "request" is "to ask for something." PO Resp. 17. Patent Owner also proposes that the term "user," within the meaning of claim 11, means "the person using the computer." *Id.* Patent Owner determines that "download request by the user" means that "a user knowingly asks for a copy of software to be downloaded from a server to the user's computer." *Id.* (citing Ex. 1001, col. 8, ll. 58–59, col. 16, ll. 54–56). Patent Owner specifically argues that upon a download request from a user, the user is presented with a form and "[o]nly once the form is completely filled out, does the server transmit the application to the client." *Id.* at 18–19 (citing Ex. 1001, col. 16, ll. 60–63). Because the user is required to complete the form, Patent Owner argues that the user is "conscious of the request and purposefully makes the request." *Id.* at 19.

Petitioner argues that the "intention of the user" when a copy of the software is downloaded is "illusory and legally irrelevant." Pet. Reply 6, 9–10. Petitioner further argues that a "download request" involves "sending data from a user's computer based on a user's 'request,' which is received by and triggers actions by the server (e.g. downloading of the updated software)." *Id.* at 8–9 (emphasis omitted).

We agree with Petitioner that the broadest reasonable interpretation of "download request by the user" does not require the "intent" of the user. We are not persuaded by Patent Owner's argument that because a user completes a form, the user "knowingly" asks for a copy of software. Patent Owner fails to direct us

IPR2014–00039
IPR2014–00738
Patent 6,628,314

to any factual basis to draw this conclusion. Furthermore, we are not persuaded that the feature must be incorporated into the claims. Patent Owner does not direct us to persuasive evidence or rationale that demonstrates that the claims require this feature. Thus, we are not persuaded by Patent Owner that the "intent" of the user is required under the broadest reasonable construction of "download request by the user." We are also persuaded by Petitioner that a "download request," under the broadest reasonable interpretation, involves sending a request from the user's computer to a server. Accordingly, we construe "download request by the user," under the broadest reasonable interpretation, to mean sending a request for downloading data from a user's computer to the server.

   3. "*providing a unique identifier to the computer*"

   Independent claim 11 recites the limitation "providing a unique identifier to the computer." Patent Owner argues that "the unique identifier be 'provided' to the computer by the server." PO Resp. 23. Patent Owner argues that the claims require the unique identifier is provided to the computer and the '314 patent specification states that "'[o]nce all required information has been provided, flow moves to block 164 where the application reports demographic data back to server 22, receives an assigned ID from the server, and stores the new user data at the client computer in user data storage 34.'" *Id.* at 23–24 (quoting Ex. 1001, col. 18, ll. 11–16) (emphasis omitted). Patent Owner further argues that the "unique identifier" must identify the computer, and not the subscriber. *Id.* at 24–25. Petitioner responds that the scopes of the claims are not limited to require that the unique identifier is provided by the server. Pet. Reply 12.

   We are not persuaded by Patent Owner that the limitation "providing a unique identifier to the computer" requires that (1) the unique identifier is provided

IPR2014–00039
IPR2014–00738
Patent 6,628,314

by the server and (2) the unique identifier identifies the computer and not the user. Claim 11 recites "providing a unique identifier to the computer" and the "identifier uniquely identifies information sent over said computer network." Claim 11 does not limit the system, process, or entity that "provides" the unique identifier. Claim 11 further only requires that the "unique identifier" identifies "information" that is sent over the computer network. The "information" identified by the "unique identifier" can include any information, including user information or computer information. This construction is consistent with the several examples provided in the '314 patent specification. *See* Ex. 1001, col. 17, ll. 13–14, 29–41, col. 18, ll. 1–20. Therefore, we determine that the limitations of "providing a unique identifier to the computer" and the "identifier uniquely identifies information sent over said computer network" mean any system, process, or entity that provides a unique identifier to the computer, where the unique identifier identifies any information that is sent over the computer network.

II.    ANALYSIS

    *A. Anticipation of Claims 11–14 and 16–19 by Guyot*

    *1. Guyot (Ex. 1006)*

    Guyot discloses a system and method for targeting and distributing advertisements over a distributed information network, such as the Internet. Ex. 1006, col. 1, ll. 9–11. The distributed information network allows for information to be exchanged between a server and multiple subscriber systems. *Id.* at col. 3, ll. 13-16; col. 3, ll. 44–47. The advertisement targeting system is set forth in Figure 1 as follows:

IPR2014–00039
IPR2014–00738
Patent 6,628,314



*Fig. 1*

The system includes server 200 and multiple subscriber systems 300. *Id*. at col. 3, ll. 15–16. Information is exchanged between server 200 and subscriber systems 300 over communication links 400. *Id*. at col. 3, ll. 17–18. Each subscriber system has a unique proprietary identifier. *Id*. at col. 3, ll. 21–22. Server 200 stores and manages an advertisement database. *Id*. at col. 3, ll. 24–25. Subscriber systems 300 periodically access server 200 to download advertisements that are targeted specifically to a subscriber based on a subscriber's personal profile stored on server 200. *Id*. at col. 3, ll. 26–29. Subscriber systems 300 then display the targeted advertisements. *Id*. at col. 3, ll. 29–30.

The advertisement database stores, for each subscriber, subscriber data that includes the subscriber's identification information, the subscriber's password, and the subscriber's personal profile. *Id*. at col. 3, ll. 55–60. The subscriber's personal profile is obtained by having the subscriber provide answers to a questionnaire. *Id*. at col. 3, ll. 60–65. The subscriber's personal profile is used to target specific advertisements to the subscriber. *Id*. at col. 3, ll. 60–61.

The subscriber system includes a memory, which stores a client application, and a processor which executes the client application. *Id*. at col. 3, ll. 30–36. The

IPR2014–00039
IPR2014–00738
Patent 6,628,314

client application establishes a connection between the subscriber system and the server and the client application uploads subscriber statistics to the server, and downloads, if necessary, the latest version of the client application software from the server. *Id*. at col. 5, ll. 18–27. The subscriber statistics preferably include information related to the advertisements displayed on the subscriber's system and information on the Internet sites that the subscriber has accessed over a predetermined period of time. *Id.* at col. 4, ll. 15–24. This information is utilized to refine the subscriber's personal profile. *Id*.

*2. Analysis*

Petitioner contends that claims 11–14 and 16–19 are anticipated by Guyot. Pet. 27–36. Petitioner has provided an analysis illustrating where each of the limitations of the claims is disclosed by Guyot. *Id.*

Patent Owner argues that (a) Guyot fails to disclose a "method of providing demographically-targeted advertising to a computer user," (b) Guyot fails to disclose "transferring a copy of the software 'in response to a download request by the user,'" and (c) Guyot fails to disclose "providing a unique identifier to the computer." PO Resp. 9–28.

*a. "method of providing demographically-targeted advertising to a computer user"*

Claim 11 recites, in the preamble, a "method of providing demographically-targeted advertising to a computer user." Petitioner argues that Guyot discloses a system and method for targeting and distributing advertisements over a distributed network. Pet. 27–28. Dr. Houh, Petitioner's expert, states that Guyot discloses subscriber data that includes a personal profile and subscriber statistics. Ex. 1003 ¶¶ 273–275. The personal profile information is generated from a questionnaire, similar to the technique described by the '314 patent specification. *Id.* ¶¶ 273–274

IPR2014–00039
IPR2014–00738
Patent 6,628,314

(citing Ex. 1001, 2:29–34).  Dr. Houh further explains that Guyot discloses that the subscriber statistics contain information on which Internet sites the user has visited and the advertisements viewed by the user, and are further used to update the personal profile.  *Id.*¶ 275 (citing Ex. 1006, 4:22–23).

Patent Owner first argues that "Guyot does not use any form of the word 'demographic' in the reference" and, therefore, fails to disclose a method of providing demographically targeted advertising.  PO Resp. 11.  We are not persuaded by this argument because a prior art reference need not disclose the exact terminology used in the claim.  *See In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990) (holding that whether a reference teaches a claim limitation "is not an 'ipsissimis verbis' test").

Patent Owner further argues that Guyot discloses that advertisements are provided to subscribers based on a personal profile provided by the subscriber, where the personal profile is obtained by having the subscriber provide answers to a questionnaire and then is updated and refined by tracking Internet sites accessed by the subscriber.  PO Resp. 11 (citing Ex. 1006, col 1, ll. 63–65, col. 3, ll. 61–63, col. 4, ll. 19–23).  Patent Owner argues that Guyot does not identify the questions included in the questionnaire, and, therefore, Guyot does not explicitly disclose that demographic information is included in the personal profile.  *Id.* at 11–13.

Petitioner responds that "demographic information" means "collected characteristic information about a user," and Dr. Houh explains that a person with ordinary skill in the art would have understood that information collected by the user profile questionnaire to establish and update the user's personal profile is "demographic information."  Pet Reply 1–2 (citing Ex. 1003 ¶¶ 266, 273–275, 278, 300–301).  Petitioner further argues that Mr. Goldstein, Patent Owner's expert,

agrees that "demographic information," under the broadest reasonable interpretation, includes web browsing history that documents that a user has visited a particular website, the frequency of the visit to the website, and the time of the visit to the website.  Pet. Reply 2–3 (citing Ex. 2015, 54:5–23).

We agree with Petitioner.  Guyot discloses a database that includes Subscriber Data and Subscriber Statistics, where the Subscriber Data includes a subscriber's identification information, password, and the personal profile of the subscriber that is used to target specific advertisements to the subscriber.  Ex. 1006, col. 3, ll. 55–61.  The personal profile is obtained by having the subscriber provide answers to a questionnaire.  *Id.* at col. 3, ll. 61–63.  The Subscriber Statistics include the advertisements distributed to the subscriber, the number of times each advertisement has been displayed to the subscriber, and further includes information on Internet sites that the subscriber has accessed over a predetermined period of time.  *Id.* at col. 4, ll. 15–21.  This information is utilized to define further a subscriber's personal profile.  *Id.* at col. 4, ll. 21–23.

As discussed in our claim construction, "demographic information" means "collected characteristic information about a user that does not identify the user." Section I.E.1.  This construction was provided by Petitioner and Patent Owner has agreed this claim construction is correct.  Pet. 10 (citing Ex. 1003 ¶¶ 105–106); Tr. 23:1–6.  Accordingly, we agree with Petitioner that Guyot's disclosure that Subscriber Statistics that include information on Internet sites accessed by a subscriber is within the broadest reasonable interpretation of "demographic information."  The Subscriber Statistics are collected information about a subscriber, such as Internet sites accessed, and this information does not identify the subscriber.  The Internet sites accessed by a subscriber describe a behavior

IPR2014–00039
IPR2014–00738
Patent 6,628,314

characteristic of a user.  This collected behavior characteristic of the user is within the broadest reasonable interpretation of "demographic information."  Guyot further describes that this information is used to define the subscriber's profile that is used to target advertisements for the user.  Ex. 1006, col. 3, ll. 55–61, col. 4, 21–23.  Accordingly, we agree with Petitioner that Guyot discloses a "method of providing demographically-targeted advertising to a computer user."

> b. *"transferring a copy of said software to the computer in response to a download request by the user"*

Claim 11 recites "transferring a copy of said software *to the computer* in response to a download request by the user."  Petitioner argues that Guyot discloses downloading an updated version of a client application in response to an automatic or manual connection by a user, and, therefore, describes "transferring a copy of said software to the computer in response to a download request by the user."  Pet. 30 (citing Ex. 1003 ¶¶ 307, 309).

Patent Owner argues that, in Guyot, the subscriber "has no information that would cause him or her to perceive even the potential that a new version of software will be downloaded" and the subscriber "is not even aware that 'the control system determines if the latest version of the client application software needs to be downloaded.'"  PO Resp. 22 (quoting Ex. 1006, col. 8, ll. 38–40).  Patent Owner argues that because the subscriber is not aware that a new version is available, it cannot be a "request by the user."  Accordingly, Patent Owner argues that Guyot fails to disclose "transferring a copy of said software to the computer in response to a download request by the user."

Petitioner responds that Patent Owner acknowledges that in Guyot software is downloaded in response to a user's action, and the intent of the user is irrelevant.  Pet. Reply 6.  Petitioner further responds that Guyot discloses that a "user

IPR2014–00039
IPR2014–00738
Patent 6,628,314

manually connects to the server, and in response to that action, the server downloads an updated version of the software to the user's computer." *Id.* at 7 (citing Ex. 1003 ¶¶ 285–292; Ex. 1006, col. 6, ll. 44–56). Petitioner argues that a user manually "clicking the 'connection button' is an action taken by the user that causes the user's computer to send a request to the server," which responds by providing a software to download. *Id.* at 9.

As discussed above in our claim construction, the limitation "download request by the user," under the broadest reasonable interpretation, does not require a specific intent of the user. Section I.E.2. As also discussed above, we are persuaded by Petitioner that "download request by the user," under the broadest reasonable interpretation, involves the sending of a request, to download data, from a user's computer to the server. *Id.* Guyot discloses that a subscriber can select a "connection button" that establishes a connection to the server. Ex. 1006, col. 6, ll. 43–46. A control system determines if the latest version of the client application software needs to be downloaded. *Id.* at col. 8, ll. 38–41. If it is determined that the latest version needs to be downloaded, a URL address pointing to the Internet site that contains the latest client application software is provided to the subscriber computer, and the latest client application software is downloaded. *Id.* at col. 8, ll. 44–49. Therefore, the manual selection of the "connection button," by the subscriber, triggers the subscriber's computer to request the downloading of the latest software from the server. Accordingly, we are persuaded by Petitioner that Guyot discloses "transferring a copy of said software to the computer in response to a download request by the user."

IPR2014–00039
IPR2014–00738
Patent 6,628,314

c. *"providing a unique identifier to the computer"*

Claim 11 recites "providing a unique identifier to the computer." Petitioner argues that Guyot discloses that each computer is identified to the server via a "unique proprietary identifier." Pet. 30. Petitioner alternatively argues Guyot discloses Subscriber Data and Subscriber Statistics for each user, where Subscriber Data includes a user's identification, password, and personal profile and Subscriber Statistics include usage information for each user. *Id.* This information is sent to the server to update the information stored by the server. *Id.* Petitioner argues that this disclosure in Guyot meets the limitation "providing a unique identifier to the computer, wherein said identifier uniquely identifies information sent over said computer network from the computer to said server." *Id.* at 30–31.

Patent Owner argues that the claims require that the "unique identifier" is provided to the computer by the server. PO Resp. 23. Patent Owner further argues that Guyot discloses Subscriber Data that identifies the subscriber, not the computer, and, therefore, does not identify information sent from the computer to the server because multiple subscribers may utilize the client application. *Id.* at 24–25. Petitioner responds that the claims do not require that the unique identifier is sent by the server to the user's computer.

As discussed in our claim construction above, we are not persuaded by Patent Owner's arguments that the claims require that the server provides the unique identifier to the computer and the unique identifier identifies the computer, not the user. Section I.E.3. We determine that the limitations of "providing a unique identifier to the computer" and the "identifier uniquely identifies information sent over said computer network" mean that any system, process, or entity provides a unique identifier to the computer, where the unique identifier

17

IPR2014–00039
IPR2014–00738
Patent 6,628,314

identifies any information that is sent over the computer network. *Id.* Guyot discloses a database that includes Subscriber Data and Subscriber Statistics, where the Subscriber Data include a subscriber's identification information, a password, and a personal profile of the subscriber that is used to target specific advertisements to the subscriber. Ex. 1006, col. 3, ll. 55–61. The Subscriber Statistics include the advertisements distributed to the subscriber, the number of times each advertisement has been displayed to the subscriber, and information on Internet sites that the subscriber has accessed over a predetermined period of time. *Id.* at col. 4, ll. 15–21. This information is utilized to further define a subscriber's personal profile. *Id.* at col. 4, ll. 21–23. Accordingly, we are persuaded by Petitioner that Guyot discloses Subscriber Data or a unique identifier that uniquely identifies Subscriber Statistics or information sent over the computer network.

### 3. Conclusion

Petitioner contends that claims 11–14 and 16–19 are anticipated by Guyot. Pet. 27–36. Petitioner has provided an analysis illustrating where each of the limitations of the claims is disclosed by Guyot. *Id.* We determine that Petitioner has demonstrated, by a preponderance of the evidence, that claim 11 is anticipated by Guyot. Similarly, we determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 12–14 and 16–19 are anticipated by Guyot.

### B. Obviousness of Claim 15 over Guyot and Robinson

### 1. Robinson (Ex. 1007)

Robinson discloses a system for the display of advertising to users of an interactive communications medium. Ex. 1007, col. 1, ll. 12–13. The system tracks activities of a subject in an interactive communications medium, derives

18

IPR2014–00039
IPR2014–00738
Patent 6,628,314

information from the activities, determines a community for the subject based on the derived information, and determines which advertisements to present to the subject based on the determined community. *Id.* at col. 3, l. 62 – col. 4, l. 6.

Tracking data can be stored locally on a user's local computer. *Id*. at col. 7, ll. 26–28. A cookie can be generated and stored on the user's computer. *Id*. at col. 8, ll. 42–44. The cookie is the only way to associate information stored on the central server with that particular user. *Id*. The cookie contains the identifier of the user, and the user ID in a central database is updated with tracking information from the cookie. *Id*. at col. 10, ll. 11–14.

*2. Analysis*

Claim 15 depends from claim 11 and further recites that the limitation of "providing a unique identifier" comprises "storing a cookie on the computer." Petitioner agrees that Guyot does not disclose this limitation and argues that Robinson discloses this limitation. Pet. 37; *See* Ex. 1003 ¶ 341. Petitioner argues that Robinson describes the use of "cookies to track user activity in the context of targeted advertising systems." *Id*. (citing Ex. 1003 ¶ 345 (citing Ex. 1007, col. 2, ll. 49–53)). Petitioner further argues that a person with ordinary skill in the art would have been motivated to combine Robinson's disclosure of a cookie mechanism that stores a cookie locally on the user's computer with Guyot for "uniquely identifying a user to enable targeted delivery of advertising." Pet. 37.

Patent Owner argues that claim 15 is not unpatentable for the same reasons discussed above with respect to claim 11. *See* Section II.A.2. We are not persuaded by Patent Owner's arguments regarding claim 11. We similarly are not persuaded by Patent Owner's arguments regarding claim 15 for the same reasons.

IPR2014–00039
IPR2014–00738
Patent 6,628,314

### 3. Conclusion

We determine that Petitioner has demonstrated, by a preponderance of the evidence, that claim 15 would have been obvious over Guyot and Robinson.

### C. Obviousness of claims 20–22 over Guyot and RFC 1635

### 1. RFC 1635 (Ex. 1022)

RFC 1635 provides information about how to use the File Transfer Protocol (FTP). Ex. 1022, 1. RFC 1635 discloses that FTP is a protocol used on the Internet to transfer files from one computer (host) on the Internet to another. *Id*. A user of an FTP program must log into both hosts using an account and password in order to transfer a file from one host to the other. *Id*.

RFC 1635 further describes the use of anonymous FTP. *Id*. at 2. An archive site is a host that acts as a repository for a wealth of information, much like a conventional library. *Id*. The information stored on these Internet hosts is made available for external users to transfer to their local sites. *Id*. To provide general access, a special user account called "anonymous" is created for the archive site. *Id*. The user account "anonymous" has limited access rights to the archive host. *Id*. The anonymous user account allows a user to log in using FTP, list the contents of a limited set of directories, and retrieve files from the archive site. *Id*.

### 2. Analysis

Petitioner argues that claims 20–22 would have been obvious over Guyot and RFC 1635. Pet. 37–42. In support of this asserted ground of unpatentability, Petitioner provides detailed explanations as to how each claim limitation is disclosed or suggested by a combination of Guyot and RFC 1635. *Id.* Petitioner further argues that a person with ordinary skill in the art would have found it obvious to prompt the user for information prior to providing the user access to

other information, as demonstrated by RFC 1635, prior to providing the client application software of Guyot, and that such a modification would have been an obvious design choice.  Pet. 39–40 (citing Ex. 1003 ¶ 369).

Patent Owner argues that Petitioner fails to set forth sufficient evidence to support a finding of obviousness and a person with ordinary skill in the art would not have combined Guyot and RFC 1635.  PO Resp. 26–28.  Patent Owner argues that a person with ordinary skill in the art would not have considered the FTP protocol when looking for a solution to obtaining answers to a user questionnaire.  *Id.* at 27.  In other words, according to Patent Owner, a person with ordinary skill in the art "interested in designing a system to induce users to provide demographic information would not be concerned with how to permit files to be retrieved.  The person would be looking in another direction entirely."  *Id.* at 27–28.  Patent Owner also argues that the anonymous FTP technique of RFC 1635 would render Guyot inoperable.  *Id.* at 3.

Petitioner responds that "'[p]rompting a user for certain information before providing a user download access to a server would have been an obvious design choice based on knowledge of this broadly-used technique.'"  Pet. Reply 14 (quoting Ex. 1003 ¶ 365).  Petitioner further responds that it would have been trivial to alter Guyot with RFC 1635, and would not have required any special skill, and, therefore, such a combination would not have rendered Guyot inoperable.  Pet. Reply 13–14 (citing Ex. 2015, 80:9–18).

We disagree with Patent Owner.  First, we are not persuaded by Patent Owner's argument that the combination of features of RFC 1635 with Guyot would have rendered Guyot inoperable because Patent Owner fails to direct us to persuasive evidence to demonstrate that such a combination would render Guyot

IPR2014–00039
IPR2014–00738
Patent 6,628,314

inoperable.  Patent Owner's conclusory assertion is tantamount to attorney arguments that cannot take the place of evidence lacking in the record.  *Meitzner v. Mindick*, 549 F.2d 775, 782 (CCPA 1977).

Second, we also are not persuaded that Petitioner has failed to provide sufficient evidence to support a finding of obviousness.  Petitioner provides the rationale, supported by expert testimony, that the modification of Guyot to include the features of RFC 1635 would have been an obvious design choice.  Pet. 39–40 (citing Ex. 1003 ¶ 369).  Accordingly, we determine that Petitioner has provided sufficient evidence, in the form of expert testimony, to support a finding of obviousness.

Third, we further are not persuaded that a person with ordinary skill in the art would not have looked to the anonymous FTP, as disclosed by RFC 1635, when concerned with collecting demographic information.  Patent Owner does not direct us to persuasive evidence on the record to support its argument.  Accordingly, Patent Owner's argument is merely a conclusory attorney argument that is afforded little weight.  Furthermore, Petitioner's expert testifies that the technique of collecting information in response to a user requesting to download access was common in the art at the time.  Ex. 1003 ¶ 366.  Accordingly, we are persuaded by Petitioner and Petitioner's expert that a person with ordinary skill in the art would have found it to be an obvious design choice to combine the feature of prompting a user for information prior to providing download access from RFC 1635 to Guyot.  *Id.* ¶¶ 365–369.

3.  *Conclusion*

We determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 20–22 would have been obvious over Guyot and RFC 1635.

IPR2014–00039
IPR2014–00738
Patent 6,628,314

### D. Adoption of the "Broadest Reasonable Interpretation" Standard

Patent Owner argues that the United States Patent and Trademark Office ("PTO") does not have substantive rule-making authority and, accordingly, Patent Owner contends that the broadest reasonable construction standard should not apply and claim construction should be carried out in the same manner as applied in a judicial proceeding. PO Resp. 28–30. Patent Owner has not provided a claim construction as would have been carried out in a judicial proceeding or alleged any distinctions between the claim construction that would have been carried out in a judicial proceeding and the broadest reasonable construction. As such, Patent Owner's argument does not articulate clearly how our determinations would be different based on a different claim construction standard. Accordingly, Patent Owner's argument is tantamount to a request for an advisory opinion.

In any event, we disagree with Patent Owner. Our reviewing court has held that "Congress implicitly adopted the broadest reasonable interpretation standard in enacting the AIA," and "§ 316 provides authority to the PTO to conduct rulemaking." *In re Cuozzo Speed Techs., LLC*, No. 2014-1301, 2015 WL 448667, at *7–8 (Fed. Cir. Feb. 4, 2015). Accordingly, the "broadest reasonable interpretation standard affects both the PTO's determination of whether to institute IPR proceedings and the proceedings after institution and is within the PTO's authority under the statute." *Id.*

### E. Patent Owner's Motion to Amend

Patent Owner proposes substitute claims 23–34, contingent in the "event that original claim 11 is found to be not patentable." Mot. to Amend 1. As discussed above, Petitioner has demonstrated by a preponderance of the evidence, that all of

IPR2014–00039
IPR2014–00738
Patent 6,628,314

the challenged claims are unpatentable. Therefore, Patent Owner's contingent Motion to Amend is before us for consideration.

As the moving party, Patent Owner bears the burden of proof to establish that it is entitled to the relief requested. 37 C.F.R. § 42.20(c). Entry of the proposed amendment is not automatic, but only upon Patent Owner's having demonstrated the patentability of those claims.

### 1. Substitute Claims 23–34

Independent claim 23, proposed substitute for independent claim 11, is reproduced below:

> 23. (Proposed substitute for original claim 11) A method of providing demographically-targeted advertising to a computer user, comprising the steps of:
>> providing a server that is accessible via a computer network,
>> permitting a computer user to access said server via said computer network,
>> acquiring demographic information about the user, said demographic information including information specifically provided by the user in response to a request for said demographic information,
>> providing the user with download access to computer software that, when run on a computer, displays advertising content, records computer usage information concerning the user's utilization of the computer, and periodically requests additional advertising content, wherein the computer usage information comprises information about the user's interactions with said computer software displaying advertising content and at least one other program,
>> transferring a copy of said software to the computer in response to a download request by the user,
>> providing a unique identifier to the computer, wherein said identifier uniquely identifies information sent over said computer network from the computer to said server,
>> associating said unique identifier with demographic information in a database,

IPR2014–00039
IPR2014–00738
Patent 6,628,314

~~selecting advertising content for transfer to the computer in~~
~~accordance with demographic information associated with said unique~~
~~identifier;~~
~~transferring said advertising content from said server to the~~
~~computer for display by said program,~~
periodically acquiring said unique identifier and said computer
usage information recorded by said software from the computer via
said computer network, ~~and~~
associating said computer usage information with said
demographic information using said unique identifier,
<u>selecting advertising content for transfer to the computer in
accordance with real-time and other computer usage information and
demographic information associated with said unique identifier, and
transferring said advertising content from said server to the
computer for display by said program.</u>

Substitute claims 24–34, recite the same limitations as original claims 12–22
but depend from substitute claim 23.

2.  *Claim Construction*

Claim construction is an important step in a patentability determination.
*Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003);
*Medichem, S.A. v. Rolabo, S.L.*, 353 F.3d 928, 933 (Fed. Cir. 2003) ("Both
anticipation under § 102 and obviousness under § 103 are two-step inquiries.  The
first step in both analyses is a proper construction of the claims . . . .  The second
step in the analyses requires a comparison of the properly construed claim to the
prior art." (internal citations omitted)).  A motion to amend claims must identify
how the proposed substitute claims are to be construed, especially when the
proposed substitute claims introduce new claim terms.  *See Idle Free Sys., Inc. v.
Bergstrom, Inc.*, Case IPR2012-00027, slip op. at 7 (PTAB June 11, 2013) (Paper
26) (informative).

IPR2014–00039
IPR2014–00738
Patent 6,628,314

Patent Owner discusses that substitute claim 23 introduces the additional elements of "wherein the computer usage information comprises information about the user's interactions with said computer software displaying advertising content and at least one other program" and the selecting of advertising content step is in accordance with "real-time and other computer usage information." Mot. to Amend 6 (emphasis omitted). Patent Owner argues that these features distinguish the proposed substitute claims from all of the cited prior art. *Id.* at 13.

Patent Owner, however, does not provide claim constructions for how the new claim terms should be construed. For example, Patent Owner does not provide any discussion or explanation as to how the limitation "selecting advertising content for transfer to the computer in accordance with real-time" is to be construed. Absent a proposed claim construction for this limitation, it is unclear as to whether the "selecting" or "transfer" is in accordance with "real-time." Accordingly, Patent Owner's Motion to Amend does not provide adequate information for us to determine whether the substitute claims are patentable over the prior art. Therefore, we are not persuaded that Patent Owner has met its burden to demonstrate the patentability of the propose substitute claims under 37 C.F.R. § 42.20(c).

### 3. *Written Description*

A motion to amend claims must identify clearly the written description support for each proposed substitute claim. 37 C.F.R. § 42.121(b). The requirement that the motion to amend must set forth the support in the original disclosure of the patent is with respect to *each claim*, not for a particular feature of a proposed substitute claim. The written description test is whether the original disclosure of the application relied upon reasonably conveys to a person of

IPR2014–00039
IPR2014–00738
Patent 6,628,314

ordinary skill in the art that the inventor had possession of the claimed subject matter as of the filing date. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). Thus, the motion should account for the claimed subject matter as a whole, i.e., the *entire* proposed substitute claim, when showing where there is sufficient written description support for each claim feature. *See Nichia Corp. v. Emcore Corp.*, Case IPR2012-00005, slip op. at 4 (PTAB June 3, 2013) (Paper 27) (representative).

Patent Owner points to several passages of the "as-filed version" of the '314 patent application for support for substitute claim 23. Mot. to Amend 6–7. Patent Owner, however, fails to point out with any particularity or explanation as to where in the several cited passages the additional limitations are supported. Patent Owner further fails to provide citations and explanations for support for substitute claims 24–34. For example, it is unclear from Patent Owner's discussion in which passage there is support for the limitation "selecting advertising content for transfer to the computer in accordance with real-time." We have reviewed the passages cited by Patent Owner and are unable to discern readily where support for this limitation is found. Accordingly, we are not persuaded that Patent Owner has met its burden to demonstrate written description support for each proposed substitute claim as required by 37 C.F.R. § 42.121(b)(1) and § 42.121(b)(2).

*4. Conclusion*

For the foregoing reasons, Patent Owner has not satisfied its burden of proof and, accordingly, Patent Owner's Motion to Amend is denied.

III.    CONCLUSION

We conclude that Petitioner has demonstrated by a preponderance of the evidence that (1) claims 11–14 and 16–19 are anticipated by Guyot, (2) claim 15

27

IPR2014–00039
IPR2014–00738
Patent 6,628,314

would have been obvious over Guyot and Robinson, and (3) claims 20–22 would have been obvious over Guyot and RFC 1635.

This is a final written decision of the Board under 35 U.S.C. § 318(a). Parties to the proceeding seeking judicial review of this decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IV.    ORDER

Accordingly, it is hereby:

ORDERED that claims 11–22 of U.S. Patent No. 6,628,314 are held unpatentable; and

FURTHER ORDERED that Patent Owner's Motion to Amend is *denied*.

IPR2014–00039
IPR2014–00738
Patent 6,628,314


For PETITIONER:

Clinton H. Brannon
Mayer Brown, LLP
cbrannon@mayerbrown.com

FOR PATENT OWNER:

Jason S. Angell
Freitas Angell & Weinberg LLP
jangell@fawlaw.com



US006628314B1

(12) **United States Patent**     (10) **Patent No.:**     **US 6,628,314 B1**

Hoyle     (45) **Date of Patent:**     **Sep. 30, 2003**

(54) **COMPUTER INTERFACE METHOD AND APPARATUS WITH TARGETED ADVERTISING**

(75) Inventor:   **Martin David Hoyle**, Destrehan, LA (US)

(73) Assignee:   **B.E. Technology, LLC**, Bay City, MI (US)

( * ) Notice:   Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 436 days.

(21) Appl. No.: **09/699,705**

(22) Filed:   **Oct. 30, 2000**

**Related U.S. Application Data**

(62) Division of application No. 09/118,351, filed on Jul. 17, 1998, now Pat. No. 6,141,010.

(51) **Int. Cl.**[7] ................................................. **G06F 3/00**
(52) **U.S. Cl.** ........................................ **345/854**; 345/853
(58) **Field of Search** .................. 345/854, 839, 345/764, 781, 853, 835; 705/14, 26; 715/501.1, 514

(56)     **References Cited**

U.S. PATENT DOCUMENTS

5,937,392 A  *  8/1999  Alberts ........................ 705/14
5,948,061 A  *  9/1999  Merriman et al. .......... 709/219

* cited by examiner

Primary Examiner—Cao (Kevin) Nguyen
(74) *Attorney, Agent, or Firm*—Reising, Ethington, Barnes, Kisselle, P.C.

(57)     **ABSTRACT**

A method and apparatus for providing an automatically upgradeable software application that includes targeted advertising based upon demographics and user interaction with the computer. The software application is a graphical user interface that includes a display region used for banner advertising that is downloaded from time to time over a network such as the Internet. The software application is accessible from a server via the Internet and demographic information on the user is acquired by the server and used for determining what banner advertising will be sent to the user. The software application further targets the advertisements in response to normal user interaction, or use, of the computer. Associated with each banner advertisement is a set of data that is used by the software application in determining when a particular banner is to be displayed. This includes the specification of certain programs that the user may have so that, when the user runs the program (such as a spreadsheet program), an advertisement will be displayed that is relevant to that program (such as an advertisement for a stock brokerage). This provides two-tiered, real-time targeting of advertising—both demographically and reactively. The software application includes programming that accesses the server on occasion to determine if one or more components of the application need upgrading to a newer version. If so, the components are downloaded and installed without requiring any input or action by the user.

**22 Claims, 14 Drawing Sheets**



80



FIG. 1



U.S. Patent    Sep. 30, 2003    Sheet 2 of 14    US 6,628,314 B1



FIG. 3



FIG. 4

U.S. Patent

Sep. 30, 2003

Sheet 5 of 14

US 6,628,314 B1



**FIG. 5**

**FIG. 5a**



**FIG. 6**

U.S. Patent     Sep. 30, 2003     Sheet 7 of 14     US 6,628,314 B1

| Image File | Destination Link | Associated Categories | Associated Links | Associated Programs | Priority Level |
|---|---|---|---|---|---|
| Banner01.gif | www.first_link.com | business, finance | www.microsoft.com\excel<br>www.lotus.com\123 | Excel™, 123™ | General |
| Banner02.gif | www.second_link.com \ products | business, shopping, computers | | Control Panel:System | High |
| Banner03.gif | third_link.com | sports | www.nfl.com<br>www.espn.com<br>www.sports.com | | Medium |
| : <br> : | : <br> : | : <br> : | : <br> : | : <br> : | : <br> : |
| BannerXX.gif | www.last_link.com\cgi\login | travel, entertainment | | | High |

# FIG. 7



FIG. 8



FIG. 9

# FIG. 10



# FIG. 11





FIG. 12



FIG. 13

Start

Access Version Numbers for each Upgradable Component in Client Application ⟋ 236

Generate Current Blueprint ⟋ 238

Access updated Blueprint from ADM Server ⟋ 240

Is Updated Blueprint Equal to current Blueprint ? ⟋ 242

Determine New Component(s) Needed ⟋ 246

New Builder Module Needed ? ⟋ 248

Pass Control to Auxiliary Module ⟋ 252

Terminate Builder Execution ⟋ 254

Yes

No

No

Yes

No Upgrading Necessary ⟋ 244

Download and Install New Component(s) ⟋ 250

Stop

# FIG. 14



US 6,628,314 B1

1

## COMPUTER INTERFACE METHOD AND APPARATUS WITH TARGETED ADVERTISING

### CROSS-REFERENCE TO RELATED APPLICATION

This application is a divisional of U.S. Ser. No. 09/118,351, filed Jul. 17, 1998, now U.S. Pat. No. 6,141,010.

### TECHNICAL FIELD

This invention relates in general to user interfaces for accessing computer applications and information resources and, in particular, to user interfaces that provide advertising obtained over a global computer network such as the Internet.

### BACKGROUND OF THE INVENTION

The continuing expansion of the Internet and other private and semi-private networks has led to the now widespread practice of electronic distribution of software to end users, whether as freeware, shareware, or fully paid-up licensed software. Traditionally, freeware programs have generally been small, unsupported single-purpose programs that are of limited use. Since no income was derived from these programs, there was little incentive for the creators of this type of software to undertake major development efforts. More recently, however, a new type of free software has emerged which, while free to end users, does provide income to the creator of the software via advertising incorporated into the software. This is of benefit both to the end user and advertiser, as the end user obtains useful software at no cost and the advertiser gets advertising exposure for its products or services. One well known example of this type of arrangement is in push technology products, such as Pointcast™, which permits a user to receive and display broadcasted information over the Internet. Using this software, new advertising is periodically received along with various requested types of news information (e.g., financial, business, sports) and is stored locally on the user's computer for later retrieval and display by the program.

The new advertising medium provided by the Internet has a number of significant advantages for advertisers. First, the users of the software within which the advertising is placed have, on average, much more disposable income to spend on products and services than the average user of other traditional advertising media, such as television or print. Second, the advertising can, in some instances, be targeted in various ways, such as demographically or reactively. An example of the latter of these is in push technology where the user requests certain types of information and this request is used to select the type of advertisement sent to the user along with the requested content. Third, the advertising can not only include audio and video elements as well as simple visual elements, but can also be interactive. For example, by clicking on the advertisement, the user can be provided with additional information about the advertised products or services and can even be given the opportunity to purchase the products or services electronically.

One of the most common methods of advertising via the Internet is through the use of links (e.g., URLs) embedded within web pages. By using embedded links, the advertisements need not be located on the same server as the web pages themselves. When the web page is loaded or reloaded, the advertising server is accessed to obtain a new advertisement which is incorporated into the web page displayed on the user's screen. These advertisements are simple graphical images (such as animated gifs) that are retrieved from the advertising server along with an associated link to additional information about the advertised product or service. While this permits new advertising to be displayed each time a web page is loaded or refreshed, and while this allows geographically unlimited advertising, it at most permits targeting of the advertisement based upon the type of information contained in the web page. Moreover, access to a new advertisement is only available during the period of time that the client computer is connected to the Internet.

Currently-available computer programs that incorporate advertising into their user interface include the necessary programming built into the software itself. That is, the various parameters relating to the presentation of the advertisement is pre-determined and programmed into the software. These parameters may include such things as where on the screen the advertisement is displayed, the display size, the duration of display, the number of times a particular advertisement is displayed, the conditions under which a particular advertisement is to be displayed, the type of action taken upon a user clicking on the advertisement, and so forth. One problem with these currently available programs is that these parameters can only be changed by replacement of the entire program with an updated, revised version, making it difficult to respond to desired changes in advertising approaches.

To provide demographically-targeted advertising, the advertiser or distributor of the advertising must obtain demographic data on its end users. Perhaps the most common way to acquire demographic data regarding users via the Internet is to request the information using a form written in html (HyperText Markup Language) and provided to the user over the World-Wide Web (WWW) using http (HyperText Transfer Protocol). This is sometimes done as a prerequisite to allowing the user access to information resources or download software from a particular web site. While authentication of demographic information obtained this way is difficult and rarely done, it has been found that end users typically provide accurate demographic data in return for free download access to software. Furthermore, studies have shown that while people are concerned about privacy issues and, in particular, do not wish to provide specific information that identifies them (such as their name, address, or Social Security number), they generally do not mind providing demographic information, nor do they mind monitoring of their computer usage as long as their usage is not associated with any specific information that could be used to identify them.

Various other arrangements have been suggested for obtaining and reporting information about an end user over a computer network such as the Internet. For example, U.S. Pat. No. 5,724,521 to Dedrick discloses an electronic advertising system in which a user profile is created and transferred to a metering server where it is used along with other end user profiles to charge advertiser's according to a consumer scale. The profile data is also used by the metering server to select advertisement titles that are sent to the end user for viewing at the request of the end user. When a user requests an advertisement, the metering server sends the advertisement to the end user, charges the advertiser, and provides the advertiser with profile data on that end user. The system can include client-side software which acquires and compiles information concerning the user's interaction with the advertising or other content provided by the metering server.

U.S. Pat. No. 5,732,218 to Bland et al. discloses a system for gathering data concerning an end-user's access to infor-

US 6,628,314 B1

3

mation resources and reporting the data back to the servers that contain the information resources. Data gathering at the client is accomplished using an applet, plug-in, or other browser extension that acquires the data and then reports that data to those servers accessed by the client, either periodically or in response to a specific request by the servers. In this way, the servers being accessed for their information resources get reported back to them information concerning the end-user's use of that information. Limited demographic information (e.g., time zone, locale, client hardware) can be included in this reporting as well.

One of the disadvantages of prior art systems that acquire data regarding an end-user's computer usage is that they are generally limited to gathering information concerning only certain limited uses of the computer. For example, in Bland et al., the focus of the gathering and use of end-user data is in the user's interaction with web pages, whether over the Internet or otherwise. Similarly, in Dedrick, the compilation of data is directed to interaction between the end-user and the advertising or other content provided by the metering server itself. By limiting the reported data in this manner, it is difficult to develop accurate profiles for the individual users that are useful in targeting the advertising.

U.S. Pat. No. 5,347,632 to Filepp et al. discloses a reception system in which both user demographics and individual system usage information can be used to target advertising. However, this information is used to select which advertisements are to be placed into an advertisement queue from which advertisements are then accessed, apparently in the order in which they were placed in the queue. Thus, this system permits targeting of advertising generally, but does not provide real time targeting of advertising based upon user actions.

Except as may be explicitly indicated otherwise, the following definitions shall apply:

computer—An apparatus having a processing device that is capable of executing instructions.

computer usage information—Data concerning a person's use of a computer, including such things as what programs they run, what information resources they access, what time of day or days of the week they use the computer, and so forth.

data set—A group of data items; for example, links, keywords, or entries in an address book.

display object—Data capable of display by a computer, including graphical images as well as multimedia presentations or other display data that includes audio in addition to visually-perceived data.

graphical image—Visually-perceived data stored in a graphic format (e.g., jpeg, gif, bmp, tiff, pcx, etc.), including electronically-reproduced photographs, graphics, animations, icons, and textual messages.

information resource—A source of information stored on a server or other computer that is accessible to other computers over a network.

keyword—A textual data item used in locating related sources of information

link—A data item that identifies the location or address of a program or information resource. A URL is a link, as is a path and filename of an information resource.

non-volatile data storage device—A memory device that retains computer-readable data or programming code in the absence of externally-supplied power, including such things as a hard disk or a floppy disk, a compact disk read-only memory (CDROM), digital versatile disk (DVD), magneto-optical disk, and so forth.

program component—A set of instructions stored in a file in computer-readable format, whether as object code or

4

source code, and whether written in a compiled language, in byte code (such as Java™), or in a scripting or other interpreted language.

program module—One or more related program components.

program—One or more related program modules.

reactively—in response to some type of user input, such as a mouse click on a particular user application or on a link to an information resource

server—A computer on a network that answers requests for information.

software application—A program and associated libraries and other files; for example, a word processing application, a spreadsheet application, or a personal information management application.

## SUMMARY OF THE INVENTION

In accordance with one aspect of the present invention there is provided an apparatus for use by a computer to provide a user of the computer with access to information resources via the Internet or otherwise. The apparatus comprises a non-volatile data storage device with first and second program modules stored on the non-volatile storage device. The first program module is operable upon execution to display a graphical user interface comprising a window separated into a number of regions, with a first one of the regions including a number of user-selectable items, at least some of which are each associated with a different data set. The data sets are each representative of a different category of information (e.g., financial, news, sports, etc.) and each of the data sets comprise a number of user-selectable links to different information resources. For example, the data sets can be groups of related URLs, whereby the information resources comprise web pages accessible via the Internet. A second one of the regions comprises an information display region which can display such things as banner advertisements. The second program module is operable upon execution to select informational data to be displayed in the information display region. The first program module is operable in response to selection of a first one of the links to provide the user with access to its associated information resource and to notify the second program module of the selection of that first link. The second program module is operable in response to notifications from the first program module to select the informational data to be displayed from among a larger amount of informational data, and the second program module is further operable to store statistical data regarding the display of the selected informational data. This permits targeting of banner advertisements based upon the type of link (financial, news, sports, etc.) selected by the user.

In accordance with another aspect of the invention, there is provided a computer-readable memory for use by a computer to provide a user of the computer with an automatically-upgradeable software application. The computer readable memory comprises a non-volatile data storage device and a program that is separated into a plurality of program modules that are stored on the non-volatile data storage device. Some or all of the program modules have at least one version identifier associated with them. One of the program modules is operable upon execution to access the stored version identifier(s) and at least one updated version identifier from a server via a global public network such as the Internet. These updated version identifier(s) represent updated program modules accessible from a server via the public network. This program module is further operable to download one or more updated program modules when the

US 6,628,314 B1

| 5 | 6 |

stored version identifier and the updated version identifier are different, with the updated program module(s) replacing one or more of the program modules. In this way, software upgrades can be carried out automatically without any user action required. Also, upgrading can be accomplished without having to download and install the entire software package.

In accordance with another aspect of the invention, a method is provided for supplying demographically-targeted advertising to a computer user. The method includes the steps of:

  providing a server that is accessible via a computer network such as the Internet,

  permitting a computer user to access the server via the computer network,

  acquiring demographic information about the user (which includes information specifically provided by the user in response to a request for the demographic information),

  providing the user with download access to computer software that, when run on a computer, displays advertising content, records computer usage information concerning the user's utilization of the computer, and periodically requests additional advertising content,

  transferring a copy of the software to the computer in response to a download request by the user,

  providing a unique identifier to the computer, with the identifier uniquely identifying information sent over the computer network from the computer to the server,

  associating the unique identifier with demographic information in a database,

  selecting advertising content for transfer to the computer in accordance with the demographic information associated with the unique identifier,

  transferring the advertising content from the server to the computer for display by the program,

  periodically acquiring the unique identifier and the computer usage information recorded by the software from the computer via the computer network, and

  associating the computer usage information with the demographic information using the unique identifier.

In accordance with yet another aspect of the invention, there is provided a computer-readable memory for use by a computer to provide a user of the computer with targeted information. The memory comprises a non-volatile data storage device and a program stored thereon. The program is operable upon execution to display a window containing an information display region. The program is also operable to select and display informational data (such as a banner advertisement) in the information display region. The informational data comprises a plurality of display objects with at least some of the display objects each having a data set associated therewith. The data sets each include one or more of the following data items:

  a category identifier that indicates a category of information to which the associated display object relates, wherein the program is operable in response to receiving user input relating to one of the categories of information to display in the information display region a display object having an associated category identifier that relates to that one category of information;

  a software application identifier that identifies a software application that may be accessible to the user via the computer, wherein the program is operable in response to user selection of the software application to display

in the information display region a display object associated with the selected software application.

These identifiers permit real time, reactively-targeted advertising since the program can respond to user interaction with the computer to determine whether the input relates to a particular category of information and, if so, can select advertising related to that category of information.

## BRIEF DESCRIPTION OF THE DRAWINGS

A preferred exemplary embodiment of the present invention will hereinafter be described in conjunction with the appended drawings, wherein like designations denote like elements, and:

FIG. 1 is block diagram of a first embodiment of the invention depicting a client software application comprising two program modules located on a computer connected to a server by way of the Internet;

FIG. 2 is a block diagram of second embodiment that is a modified form of the that shown in FIG. 1;

FIG. 3 is a block diagram depicting further details regarding use of the server shown in FIG. 1;

FIG. 4 is a block diagram of a third embodiment of the invention depicting a client software application broken into a number of modules including a builder module responsible for upgrading and addition of any of the program modules;

FIG. 5 is an exemplary view of the graphical user interface (GUI) generated by the client software application of FIG. 4;

FIG. 5a is an exemplary view of a bookmark category window generated by the client software application of FIG. 4;

FIG. 6 is block diagram that provides additional detail regarding the client software application depicted in FIG. 4;

FIG. 7 depicts the structure of the banner database used by the client software application of FIG. 4;

FIG. 8 depicts a method for providing access to the client software application and for obtaining and utilizing demographic information regarding users of the software application;

FIG. 9 is a flow chart of the portion of the client software application of FIG. 4 that handles user login as well as acquisition of demographic information for new users of the application;

FIG. 10 is a flow chart depicting an overview of the core operation of the client software application of FIG. 4;

FIG. 11 is a flow chart of the processing of user input that is carried out by the client software application of FIG. 4;

FIG. 12 is a flow chart of the processing of key events that is carried out by the client software application of FIG. 4;

FIG. 13 is a flow chart of the process used by the builder module of FIG. 4 to upgrade different program modules or components used in the client software application; and

FIG. 14 is a flow chart of a alternative process that can be used by the builder module of FIG. 4 to upgrade program modules or components used in the client software application.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring first to FIG. 1, there is shown an overview of a client software application 10 comprising a graphical user interface (GUI) program module 12 and an advertising and data management (ADM) program module 14. Working

7

together, these program modules act as a single software application that provides the computer user with a fully integrated interface to the other software applications loaded on the user's computer 18, as well as to information resources located on a private or public network, such as the Internet 20. Client application 10 may also include other executables, support files, and libraries that are used by program modules 12 and 14. In general, GUI module 12 contains the basic programming necessary to provide a user interface to the computer's software applications and operating system (e.g., Windows98 or WindowsNT), while ADM module 14 provides the basic management of the display and refreshing of advertising as well as the acquisition and reporting of computer usage information to an advertising and data management (ADM) server 22 via the Internet 20.

Computer 18 is a conventional personal computer, such as one that utilizes an Intel™ Pentium™ microprocessor. As is common, computer 18 includes RAM, a hard disk drive, a floppy drive, a CD-ROM or DVD drive, a mouse or other serial input device, a keyboard (all not shown), as well as a monitor 26. Computer 18 also includes a network adapter card through which it accesses the Internet. Alternatively, it can include a modem for accessing the Internet via a standard telephone line. As will be discussed below, client software application 10 is initially stored on a computer-readable memory (such as a hard drive) at server 22 and a copy is then downloaded and stored on the hard drive of computer 18 in response to a download request by the user.

As will be discussed in greater detail below in connection with FIGS. 5 and 6, GUI module 12 generates an application window 24 that is displayed on the computer monitor 26. This window is separated into a number of regions, one of which is a banner region 28 for advertisements or other messages processed by ADM module 14. The advertisements displayed in banner region 28 are display objects such as graphical images that are stored on the computer's hard drive or in other non-volatile memory as a file or multiple files which are collectively represented in FIG. 1 as banner storage 30. They are accessed as needed by ADM module 14 and displayed in banner region 28. Upon ADM module 14 determining that new advertising is needed, it accesses the Internet via an existing TCP/IP connection 32 and downloads new banners from ADM server 22. Periodically, computer usage information is sent to ADM server 22 for use in profiling the end user and better targeting future advertising to the end user. This computer usage information is stored on the end user's computer 18 in user data storage 34, which again can be the computer's hard drive or other non-volatile storage.

By separating out the advertising and end-user data management functions and providing them as a separate program, these functions can be changed easily by replacing the ADM module 14 without the necessity of downloading and installing an entire new version of the software. This update capability can be programmed into GUI module 12 (or, possibly, into ADM module 14) so that it periodically checks with server 22 for an updated ADM module 14 and, if found, downloads the new program and installs it as necessary. This can be done automatically without the client software application requiring any user input, if desired.

ADM module 14 can be downloaded as object code, in which case it can be executed as is and can be started by the GUI program 12 each time that program is run. Optionally, ADM module 14 can be written in byte code, such as Java™, or even in a suitable scripting or interpreted language. If desired, the execution engine needed for these latter types of programming can be provided originally as a part of the total

8

software application 10. Alternatively, existing execution engines, such as those found in Java™ and JavaScript™-enabled browsers, can be used to execute ADM module 14 upon call by GUI module 12. Moreover, if written in one of these latter programming languages, GUI module 12 or ADM module 14 can initiate operation of the browser (if not already running) and can direct the browser to ADM server 22 in which case the new version of ADM module 14 can be automatically downloaded and run by the browser.

Although ADM module 14 is shown in FIG. 1 as handling storage of the computer usage information and banner advertising, as well as display of the advertising and reporting of the computer usage information, it will be appreciated that most of these functions can be handled by GUI module 12, with ADM module 14 simply providing the basic logic and rules which govern the display and reporting functions. This is shown in FIG. 2. In this embodiment, GUI module 36 still reports events to ADM module 38 which, as in the system of FIG. 1, determines what action is to be taken. However, it is GUI module 36 that actually does the work, including accessing or storing data in banner storage 30 or user data storage 34, reporting computer usage information to ADM server 22, accessing new banner advertising from server 22 and, when available, downloading a new ADM module 38. One advantage of this separation of functions between GUI module 36 and ADM module 38 is that it permits ADM module 38 to be written as a streamlined program module that occupies a minimum amount of storage space so that the basic logic governing advertising processing can be easily and quickly upgraded by downloading a new ADM module 38.

Referring now to FIG. 3, ADM server 22 is accessible via the Internet by any of a number of remotely located client computers 40 on which client software application 10 is installed. This can include client computers that are connected directly to the Internet, as well as computers connected via private or other types of networks, such as a LAN 42. ADM server 22 is associated with it an Advertisement Database 44 and a User/Demographics Database 46. Ad Database 44 stores the banner advertising that is provided to the client computers 40 both initially when client application 10 is installed and thereafter periodically as the advertising needs to be replaced. As will be discussed in greater detail below, each advertisement is assigned to one of three priority levels (general, medium, or high) that are used in reactively targeting the banner advertisements. These assignments of the advertisements are stored along with the advertisements themselves in Ad Database 44. Periodically, new advertising can be added to Ad Database 44. Preferably, this is accomplished via the Internet with the new advertising being downloaded from one or more Advertising Servers 50, which may be run by an advertising distribution organization or may simply be computers operated by the individual advertisers themselves.

User Database 46 stores the demographic information used in targeting the advertising downloaded to the individual client computers 40. As will be described below, when a user first accesses client application 10 for the purposes of downloading and installing the software, demographic data is obtained on the user and that information is then used to determine what advertising will be provided to that user. Whenever new advertising is required for a particular user, the relevant information from User Database 46 will be used to determine which advertisements should be downloaded to that user's computer.

In addition to advertising selection and distribution, ADM server 22 also handles the distribution of upgrades to client

US 6,628,314 B1

9

software application **10**. In general, the upgrading process involves communication between ADM server **22** and the client computers **40** to determine what program modules are installed at the client computer and to compare those modules to the latest set **48** maintained at ADM server **22**. As will be described in connection with FIGS. **4** and **13**, this is preferably accomplished using a "blueprint" that contains an identifier (filename and version number) of each of the program modules used by client software application **10**. Once it is determined that one or more program modules need to be updated, they are accessed at ADM server **22** and downloaded to the requesting client computer **40** and installed.

Turning now to FIG. **4**, there is shown a third embodiment of the client software application. In this embodiment, the software application can have the same functionality of the first two embodiments, but is separated into a number of program modules that interact to provide this functionality. In particular, it includes a GUI module **52** and ADM module **54** as in the first two embodiments, but further includes a notes module **56**, I/O module **58**, login module **60**, PDA module **62**, builder module **64**, and auxiliary module **66**. Some of these additional modules, such as the notes module **56**, provide added functionality not included in the modules of the FIGS. **1** and **2** embodiments. Other of these modules, such as I/O module **58**, perform functions that were incorporated into the GUI and/or ADM modules of FIGS. **1** and **2**.

Before describing the various modules in detail, reference is made to FIG. **5** which depicts a Windows™ version of the user interface provided by GUI module **52**. The user interface comprises application window **24** separated into a number of regions. These regions include a pull-down menu **70**, a set (toolbar) of menu icons **72**, a URL text field **74**, a toolbar containing application icons **76**, a banner advertising region **78**, and a toolbar containing bookmark category icons **80**. While some of these regions provide unique commands and functions that will be described below, the programming used to generate the display in these regions and to enable interactivity with the items displayed within these regions is well within the level of skill in the art. Pull-down menu **70** contains the basic commands available to the user, including launching applications, accessing basic editing commands, changing the display of the user interface, adding and removing application and bookmark category icons, changing window views, and obtaining help. Menu icons **72** contain a number of icons that permit quick access to some of the more common commands contained in menu **70**. URL field **74** is a conventional drop-down input box that can be used for entering URLs or path and file names of locally-stored web pages. Once a user has entered a web page location into this field and pressed Enter, GUI module **52** initiates operation of the user's default browser and directs it to access and display the specified web page. Banner advertising region **78** is an information display region in which is displayed graphical images comprising advertising stored locally on the computer. These advertisements are replaced in response to various events including, in particular, user interaction with the computer. Application icons **76** provide single-click initiation of any programs accessible by the user's computer. When client software application **10** is first installed, it initially builds this toolbar using the shortcuts existing on the computer's Windows™ desktop. Thereafter, the user can customize this toolbar, either by dragging icons onto or off of the toolbar, or via a suitable command available under the "Tools" menu item. The client software application can be programmed to

10

automatically add or remove icons from this list when they are added or removed from the Windows™ desktop. Furthermore, the icons can be automatically organized by the program, either in alphabetical order or otherwise. The bookmark category icons **80** are each associated with a set of links related to a particular category of information, such as finance, news, or sports. By selecting one of the icons, a separate application window containing the related links is opened on the screen. This is shown in FIG. **5a**. This window also includes a vertically-oriented toolbar containing bookmark category icons **80** so that the user can switch to other categories of links by clicking on the appropriate icon **80**. The program is operable to respond to the user's selection of any one of the links by accessing the selected web page using the default browser. As with the application icons **76**, bookmark category icons **80** can be added or removed from the toolbar. Furthermore, additional links can be added to the categorized sets of links, whether by conventional drag and drop methods (i.e., dragging onto the bookmark category icons **80**) or via menu commands.

To permit user customization, the toolbars containing application icons **76** and bookmark category icons **80** include a slidebar **82** that is initially positioned at the far left of the toolbar, as illustrated, and that can be moved by the user to a location between any two icons on the toolbar. Thereafter, icons to the left of the slidebar cannot be re-organized except by express action of the user. These toolbars also each include left and right arrow buttons **84** that shift the icons in the associated toolbar to the left and right, respectively. These arrow buttons will not affect any icons located to the left of slidebar **82**. Each of the toolbars, including the pull-down menu toolbar, includes a collapse button **86** that serves to toggle the display of its associated toolbar. This permits users to collapse the display size of the graphical user interface and to hide those toolbars that the user does not wish to utilize often.

A final region of window **24** is a conventional linked icon **88**, which can be used to direct the user's default browser to the home page of the company that provided client software application **10**. Also, window **24** can include another icon (not shown) that, when selected, accesses a local floppy or other non-volatile data storage device to retrieve various types of data. For example, a user may want to utilize client application **10** on different computers; for example, a laptop and home or office desktop computer. To prevent the user from having to separately customize each of the two user interfaces, GUI module **52** is operable to store the user's customization settings and preferences on a floppy disk or other non-volatile storage. This disk can then be inserted into the other computer and, once the client application is executed, clicking on the same icon will cause the program to access the disk and to retrieve and apply the user's customizations and preferences to the user interface.

In addition to the toolbar containing bookmark category icons **80**, window **24** can also include a "home" or "local" toolbar (not shown) containing the same icons **80**, but with the links associated with each category icon **80** being specific to the user's local and regional interests. Thus, for each category of information, this permits the user to keep links to local web sites separate from their other links. In this way the user can, for example, keep links related to local high school sports separately from links for professional sports. When an icon on this "home" toolbar is selected, a window (not shown) separate from that shown in FIG. **5a** can be opened or, alternatively, the FIG. **5a** window itself can be used, with a button or other means being provided to allow the user to switch between the icons representing the

US 6,628,314 B1

11                                                                12

"home" groups of links and the icons representing the other groups of links.

Referring now to FIGS. 4–6, the details of the various program components and modules that comprise client software application 10 will now be described. As application above, GUI module 52 provides the programming used to display application window 24 including all of its various regions on a computer monitor or display 26. It accesses user customizations and preferences from user data storage 34 via I/O module 58 and interfaces with the other program modules. The user interface provided by GUI module 52 is implemented using a number of program components written in ActiveX™. These components include a toolbar component 90, a URL text field component 92, a drag button component 94, a drag and direct component 96, a collapsible menu component 98, a collapsible toolbar component 100, a user profile access component 102, and an advertising banner component 104.

Toolbar component 90 contains the programming code used to display and manage the applications icons toolbar 76 and the bookmarks categories toolbar 80. This includes the programming that generates the slidebars 82 and left/right buttons 84. This component interfaces with drag button component 94 which contains the programming that generates the various toolbar buttons that are represented by the different icons 76 and 80. Toolbar component 90 also interfaces with drag and direct component 96 which allows the user to customize the toolbars by shifting the icon buttons left or right on the toolbars, as well as drag and drop capabilities to add buttons to or remove buttons from the toolbars. URL field component 92 provides the URL text field 74 that permits direct user input of URL's. Collapsible menu component 98 contains the programming that generates and provides functionality to the pull-down menu 70. Similarly, collapsible toolbar component 100 is used to generate the toolbar containing the menu icons 72. Components 98 and 100 can be derived from the main toolbar component 90 and can function like any other toolbar, except that they are collapsible. User profile access component 102 contains the programming used to access the a computer's floppy disk drive (as well as any other source) to read or write the user's customizations and preferences of the user interface. Banner component 104 contains the programming used to access and display an advertising banner specified by ADM module 54. In addition to the drag and drop capabilities discussed above, GUI module 52 can also include the programming necessary to permit dragging of links onto category icons to add them to the associated set of links, as well as dragging of data files (e.g., documents) onto the application icons to initiate execution of the selected application using the selected data file.

ADM module 54 includes a key event component 108, a timer/display component 110, a flag alert component 112, and an error handling component 114. These components are preferably written in ActiveX™ or Java™. User interaction with the computer, whether with the client software application itself or with other applications or the operating system, is monitored by GUI module 52 and reported to key event component 108. As will be understood by those skilled in the art, the detection of user input to other programs and to the operating system itself can be implemented under Windows™ using system hooks. Key event component 108 determines whether the user interaction constitutes a key event; that is, whether a change in displayed banners should be made in response to the user input. If so, it informs timer/display component 110 which contains the programming that determines which banner should be displayed and what computer usage information should be stored for later reporting to ADM server 22. This component also includes a timer that periodically changes the advertisement displayed in banner region 78 in the absence of any user input. The selection of banners will be further described below in connection with FIG. 7.

Once a group of banners have been displayed their allotted number of times, timer/display component 110 notifies flag alert component 112, which sets a new banner flag. This flag is checked periodically and if set, ADM server 22 is accessed to download new banner advertising. If desired, flag alert component 112 can also maintain other flags for use by the system to record the state of various events. For example, it can include a flag that indicates whether the current execution of client software application 10 is the first execution following installation of the software. If so, a special introductory screen could be displayed. Other such uses will become apparent to those skilled in the art. Error handling and messaging component 114 is used to handle error conditions such as, for example, where a user has uninstalled a software application off the computer, but attempts to execute the uninstalled application from an application icon 76 still residing on the applications toolbar. This component can intercept the error message generated by the operating system and take appropriate action such as, for example, informing the user that the application cannot be located and asking whether the user wishes the application icon to be removed from the toolbar.

As mentioned above, client software application 10 monitors the user's interaction with applications other than itself using system hooks. As will be appreciated, this permits the client software application to alter the normal response seen by the user to certain types of interactions with the computer. For example, GUI module 52 preferably monitors user action and, upon detecting that the user has initiated execution of a browser application, whether via an application icon 76 or directly via the computer's operating system itself, GUI module 52 can override the browser's default home page setting and redirect it to another web site. Preferably, the user is queried via a pop-up dialog box prior to redirection to ascertain whether he or she objects to starting the browser at some web site other than the default home page. This can be used as an additional means of exposing the user to advertising while providing the user with some variety in the use of their browser, since they are not limited to always seeing the same site upon startup of the browser. Other such uses of this feature will be apparent to those skilled in the art.

Notes module 56 provides messaging capabilities not only for personal use by the user, but also for use among different users. From the user's standpoint, the notes themselves comprise small pop-up windows containing short messages or reminders. These notes can be associated with certain events. For example, the user could set up a personal note that pops up at the end of the day when the user goes to exit the application. Alternatively, one user could send another user a note related to sports and could set that note to only pop-up when the receiver either accesses the sports bookmark category icon 80 or accesses a sports-related web site. The notes functions (e.g., creating a new note, sending a note, etc.) can be accessed via Tools under the pull-down menu 70. Notes sent between different users connected to the Internet is by way of ADM server 22, which acts as a messaging server, identifying individual users (whether senders or receivers) by way of their unique ID and handling the receipt and distribution of the notes.

Notes module 56 includes a display component 116, a logic component 118, a registration component 120, and a

13                                                          14

send/receive component 122, all of which can be written in ActiveX™ or Java™. The notes display component 116 contains the programming responsible for the actual display of the pop-up notes on the monitor. The notes logic component 118 is responsible for the logical processing of the notes; for example, determining when or under what conditions a note will be displayed. Registration component 120 handles registration of the client software application with the messaging server process provided by ADM server 22. The send/receive component interfaces with I/O module 58 and is responsible for the actual transmission and reception of notes over the Internet.

I/O Module 58 is used as the interface between the various program modules and banner storage 30, user data storage 34, the Internet 20, and, if connected, a printer (not shown). It includes a reporting and printing component 124, a streams component 126, and a file I/O component 128. These components can all be written in ActiveX™ or Java™. Reporting and printing component 124 contains the programming code used to properly format and direct data to its proper output device (e.g., a printer, log file, etc.). The streams component 126 is used to manage the input and output functions which establish and provide data transmissions between components and objects. It is this component that is used to access the Internet via TCP/IP and can be used with other communications protocols, such as RMI and COM. The file I/O component 128 is used to manipulate stored files, including those used in the banner data storage 30 and user data storage 34.

Login module 60 (FIG. 4) comprises an ActiveX™ or Java™ login component which includes the programming that provides the user login and password validation features. If desired, this module can also include a security component that provides encryption of data transmitted over the Internet. PDA module 62 is an ActiveX™ or Java™ component that can be used to handle importing and exporting of user data between the client software application and the formats needed for use with a personal digital assistant. Also, this module can be used for interfacing the client software application with the user's current personal information management software, such as Outlook™, Lotus Notes™, or Netscape™ mail. The security module can also include an import/export wizard for use by the user in converting between formats.

Builder module 64 interfaces with all of the other modules and contains the programming used to upgrade individual components of the software application from time to time. As with most of the other modules, it can be written in ActiveX™ or Java™. For purposes of upgrading components, each component has associated with it a version identifier that comprises a version name and version number, with the version name simply being the filename of the component or module. Builder module 64 is operable to determine the version name and number for each of the components currently installed on the client computer and to generate from that a current blueprint of the components. Then, the next time an Internet connection is available, the builder component can access ADM server 22 and download from it an upgraded blueprint. The builder module then compares these blueprints to determine whether the client software application installed on the computer is the most current version available. If not, the builder, having both blueprints, can determine specifically which new components it needs. Upgrading of existing components is typically accomplished simply by overwriting the existing files and making the appropriate entries into the Windows™ Registry. At the server side, adding new components to the

application simply requires creating the new component and upgrading the existing components to work with the new component, followed by adding the new and revised components to the upgraded blueprint. Then, the next time the server is access by the builder module, it will download the new and revised components.

This upgrading process is implemented automatically by the client software application without requiring any user input or initiation of the process. Also, by modularizing the application in the manner described above, bug fixes and upgrading of features can be achieved without requiring downloading and installation of the entire software application. This is especially useful for distribution of software via the Internet, since software applications typically require anywhere from several Megabytes to tens of Megabytes of disk space and the downloading of such large files can be burdensome.

It may be desirable or necessary from time to time to upgrade the builder module 64 itself so that it can evolve and provide new features not currently anticipated. For this purpose, auxiliary module 66 is provided. Upon builder module 64 determining from the blueprints that it needs to be upgraded itself, it turns over control to auxiliary module 66 and then terminates its execution so that it may be overwritten with the new builder module. Auxiliary module 66 then handles downloading and installation of the new builder module and other components.

As will be appreciated by those skilled in the art, builder module 64 or any of the other modules can have their own set of module commands which they use to perform particular functions. These module commands can be used by other modules to access or implement functions provided by that module. Additional module commands and, thus, additional functionality, can be added simply by creating upgraded modules that include the new module commands and using builder module 64 to upgrade to the new modules in accordance with the procedures described herein.

Referring now to FIG. 7, the details of the selection and use of banner advertising will now be described. In general, banners are displayed either in response to some user action (input) or, in the absence of user input, are displayed periodically at timed intervals. The client software application monitors the user's inputs to the computer and, when possible, targets the banner advertising displayed so that it relates to the what the user is doing.

Preferably, the banner advertisements are stored as graphical images on the client computer's hard drive and are replaced once they have been displayed a certain number of times. As mentioned above, this is accomplished by downloading new banner advertisements from ADM server 22. To avoid running out of banners before new ones can be downloaded from ADM server 22, client software application 10 maintains a plurality of sets of locally stored banners and, at any one time, only displays banners contained in one of the sets. Then, when the banners in that set have all been displayed the allotted number of times, the next set of banners is used with the old set being replaced the next time that server 22 is accessed.

A banner database 130 is stored on the client computer's hard drive along with the image files themselves. This database contains information that is used by timer/display component 110 to determine when the banner should be displayed. In the representation of banner database 130 shown in FIG. 7, each row is a data set that is associated with a different one of the banners. The columns represent individual data items within each data set. The data for each

US 6,628,314 B1

15                                                                                      16

banner includes the filename of the image file, a destination link, one or more associated category identifiers, one or more associated trigger links, one or more associated programs, and a priority level. The destination link is (typically) the URL of the web site to which the default browser will be directed if the user clicks on the banner while it is displayed. The category identifiers specify those categories to which the banner relates and can correspond exactly to the categories used in connection with the bookmark category icons **80** discussed above in connection with FIG. **5**. For example, an advertisement for a securities brokerage would be related to finance and possibly business. By associating those category identifiers with the banner in database **130**, ADM module **54** will be able to determine the proper time for display of the brokerage advertisement. The associated trigger links specify locations for which the associated banner should be displayed when one of the specified sites are accessed. In the first example given in FIG. **7**, if the user were to direct his or her browser to www.lotus.com/123, ADM module **54** would display the banner01.gif image. Where multiple banners are associated with the same link, ADM module **54** determines which of the banners should be selected based on another criteria such as number of times each banner has previously been displayed. The associated programs column is similar in that execution of one of the specified applications (rather than a visit to a web site) will result in an associated banner being displayed. Finally, the priority level is used to determine the specificity of the targeting of the advertisements.

More specifically, ADM module **54** is programmed to select and display banners at any one of three different levels of processing. The first is the general level, which is the default priority level at which the processing is set when the client software application is first executed. In this mode, only banners having a general priority level will be displayed. The second level is the medium processing level, in which both medium and general banners are displayed, but at a weighting that favors the medium banners. Preferably, when operating in this mode, only one general priority level banner is displayed for every three medium level banners. Similarly, the third level is the high level at which high, medium, and general banners are displayed, with ten high priority level banners being displayed for every three medium level banners and for every one general level banners. The processing level at any one time is determined by the user's actions. In particular, when the user begins execution of an application or selects one of the bookmark category icons **80**, the processing level is set to medium so that no high level banners will be used for display. When the user selects a link, the processing level changes to high at which point all banners are candidates for display, with the high priority level banners being given favoritism in the 10–3–1 ratio mentioned above. This ratio can be adjustable by ADM module **54**, if desired.

It will be appreciated that other data items for the banners can be included in database **130**. For example, each banner can have associated with it a maximum number of permitted displays, with this number being decremented each time that the banner is displayed. This allows different advertisements differing amounts of exposure. Similarly, each banner can have associated with it a weighting or frequency that is used by ADM module **54** to determine how often the banner should be displayed relative to other banners at the same priority level. A "display first" property can also be provided for any particular banner that indicates that it should be displayed before others at its same priority level, with timer/display component **110** providing the programming

needed to insure that only one such banner at each priority level has this property set. Apart from the category identifiers, each banner can also have a number of keywords associated with it and ADM module **54** can be programmed to examine the web pages visited by the user to determine if any of those keywords are present, whether they be located in the web page as META TAGs or simply contained in the text of the page. If so, one of the banners associated with the located keyword could be displayed.

As will be apparent to those skilled in the art, client software application **10**, acting in conjunction with ADM server **22**, provides a two-tiered approach to targeted advertising. The first tier is the initial selection of banners to be downloaded to the user based upon the user's demographic information. The second tier is the reactive targeting of the advertisements based upon user interaction with the computer. Moreover, since client software application **10** communicates with server **22** from time to time and can report back computer usage information as well as information concerning the display of the banners, this information can be associated with the user's demographic information (by way of their unique ID) at the server and then used by the advertisers to help them understand the consuming public.

As will be appreciated by those skilled in the art, the reactive targeting provided by client software application **10** is handled in real time, rather than simply as a part of building a set of advertisements for later display to the user. This permits the display of advertising that is relevant to what the user is doing at any particular time. Thus, if the user is using the computer to search for information on stocks, then client software application **10** can detect this (whether by recognizing the web site being accessed, the keywords used in the web pages being accessed, the program being executed, or some other aspect of the user's search) and can display an advertisement that is relevant to this topic, whether it be for a stock brokerage, a stock exchange, an investment group, or some other organization. Furthermore, for user computers that enjoy a full time connection to the Internet, the reactive targeting can be used to access a specific advertisement over the Internet, rather than from a pre-stored banner from banner storage **30**. This can be accomplished by replacing the local image filenames in the first column of banner database **130** with an Internet address of a specific image file. Alternatively, the user's actions that are used to select an advertisement via banner database **130** can be sent to ADM server **22** or some other advertising server as posted form data, with the server using the data to select and download an appropriate advertisement. This permits real time targeting of advertising while expanding the available pool of advertisements without having to previously download the complete set of advertisements to the user's computer.

Referring now to FIG. **8**, the process for providing access to the client software application and for obtaining and utilizing demographic information regarding the user will now be described. As will be appreciated, the software download and data gathering process of FIG. **8** can be implemented by a suitable server program residing on ADM server **22**. As indicated at blocks **132** and **134**, in response to server **22** receiving a download request from a user, the server sends a form to the user and then waits for the completed form to be posted back to the server. The form can include a number of required fields that provide the minimum data needed to generate a proper demographic profile of the user. Once server **22** has received the completed form, a check is made to determine whether all of the

17                                                                                          18

required fields have been completed, as indicated at block **136**. This check can include a certain amount of validity checking of the data. For example, if the user is required to specify the city and state in which they live, a check could be made to determine whether the city and state reported by the user actually exists. Similarly, a reported area code could be checked to determine its validity. If required information is missing or invalid, flow moves to block **138** where the server resends the form with a request for correction. As is known, this can include an identification of the particular required data that was missing or invalid. Once server **22** receives a correctly completed form, flow moves to block **140** where server **22** assigns a unique ID to the user and then stores that ID along with the received demographic data, as indicated at block **142**. As discussed above in connection with FIG. **3**, this data is stored in the user/demographics data base **46**. Then, an initial set of banner advertisements and links are selected based upon the user's zip code, indicated at block **144**. The links are used to provide an initial set of links for each of the bookmark categories represented by icons **80**. Thereafter, client software application **10** is downloaded to the user's computer for installation by the user, as indicated at block **146**. Preferably, the client software application is packaged as a single, self-extracting ZIP file and includes an installation program that handles installation of the program and all of its components into proper directories, as well as making the necessary entries into the Windows™ Registry.

The user ID that is stored along with the demographic data is used to anonymously identify the user for the purpose of demographically targeting advertising to that user. This can be accomplished by assigning the user ID to the particular copy of the client software application downloaded by the user. Alternatively, the user ID can be included in a cookie placed by server **22** on the user's computer **18** and this cookie can be accessed by server **22** each time computer usage information is sent to server **22** so that the ID can be associated with the computer usage information. In the illustrated embodiment, the user ID is associated with a user login that is required each time the client software application is executed. By having the user login to the application, it can identify which demographics are associated with this particular user. Also, the provision of a user login allows the client software application to be utilized by multiple users, while permitting different demographically targeted advertising to be displayed for each user. This will now be described in connection with FIG. **9**.

As shown in FIG. **9**, upon execution of the client software application **10**, a login and password input box is displayed. This is shown at block **148**. Once the user has entered a login name, a check is made at block **150** to determine whether the user name is new. If not, a check is made at block **152** to determine whether the password provided for the recognized login name is correct. If not, flow returns to block **148** where the login box is again displayed. If the password is correct, flow moves to block **154** where the application accesses the user's set of preferences and customizations for the display of the graphical user interface. The application also accesses the banner database and various bookmark categories for that user which, as described above, contains for each category of information a number of links to different information resources. Flow then moves to block **156** where the graphical user interface is displayed along with a first banner. The login names and associated passwords can be stored in the user data storage **34**. Similarly, the user preferences, categorized lists of bookmarks, and banner database can be stored in user data storage **34**.

If, back at block **150**, the login name is determined to be new, the user can be queried as to whether they would like to set up a new account, as indicated at block **158**. If not, then flow returns to block **148** where the login screen is again displayed. If a new account is desired, flow moves to block **160** where the application requests various demographic data, which can be the same data requested of the user who originally downloaded the application from server **22**. At block **162** a check is made to determine whether all required demographic data was provided. If not, flow returns to block **160** to again request the required data. Once all required information has been provided, flow moves to block **164** where the application reports demographic data back to server **22**, receives an assigned ID from the server, and stores the new user data at the client computer in user data storage **34**. Flow then moves to block **166** where default preferences and bookmark lists are accessed and assigned to the new user. Flow then moves to block **156** where the graphical user interface is displayed, at which point the user can begin normal use of the application.

If desired, all user-specific information, including logins, password, demographic data, assigned ID, preferences, banner database, and bookmark lists can be stored together as a separate file and treated as a separate user object. This file can be both stored locally on client computer **40** and reported back to server **22**. Moreover, this single file can then be used to transfer the user specific data between different computers upon which the application resides. By storing the demographic data at the client itself, demographic targeting of advertising can be accomplished if desired by client software application **10** itself. Furthermore, in situations in which the computer operating system requests a login as a part of boot-up of the computer, or in networked environments where a login at the computer is required for network access, client software application **10** can use the identification of the user provided by these logins rather than requiring a separate login upon execution of the application itself. This allows the client software application to determine who is using the computer without having to request a separate user login.

Turning now to FIG. **10**, there is shown an overview of the core operation of client software application **10**. The first step is at block **168** where a check is made to determine whether access to ADM server **22** is needed. Access may be needed to report computer usage information or to download new banner advertising, for example. If no access is currently needed, flow moves to block **170** where a check is made to determine if there is any user input to the computer. If not, flow moves to block **172** where a check is made to determine whether the timer operated by timer/display component **110** has expired. If not, no action is taken and flow returns to block **170** to again check for user interaction with the computer. If the timer has expired, flow moves to block **174** for selection and display of a suitable banner. If, at block **170** user input was detected, flow moves to block **176** where the user input is processed. Flow also moves to block **178** where a check is made to determine whether the user interaction constitutes a key event. If not, flow returns to block **168** and the process repeats. If a key event is detected, then flow moves to block **174** where the key event is processed.

If, at block **168** it was determined that access to ADM server **22** is needed, flow moves to block **180** where a check is made to determine whether an Internet connection is available to the client computer. If no connection is available, the server cannot be accessed at this time and flow therefore moves to block **170**. If an Internet connection is

19

available, flow moves to block 182 where the current computer usage information is reported to ADM server 22. Then, if necessary, the client software application downloads new banners, as indicated at block 184. Flow then moves to block 186 where the new banner flag is reset along with any flags used in reporting of computer usage information. At block 188 a check is then made to determine whether any of the components of software application 10 need to be upgraded. If not, flow moves to block 170 to look for user interaction. If a newer version of one or more components is available, flow moves to block 190 where the builder routine is executed.

Referring now to FIG. 11, the processing of user input represented by block 176 of FIG. 10 will now be described. This processing begins at block 192 where a check is made to determine whether a user has selected a banner by, for example, a mouse click on the banner itself. If so, flow moves to block 194 where the URL associated with the selected banner is accessed and the user's default browser used to access the site specified by that URL. This process then ends with the flow returning to block 168 of FIG. 10. If at block 192, a banner has not been selected, flow drops down to block 196 where it is determined whether a shortcut or application has been selected. This includes any of the application icons 76 on the application's graphical user interface itself or a shortcut or application selected from the Windows™ desktop. If so, flow moves to block 198 where the priority is set to medium following which flow moves to block 200 where the shortcut or application is executed or otherwise processed in accordance with the normal operation of the operating system. If at block 196 it was determined that no shortcut or application was selected, then flow moves to block 202 where a check is made to determine whether one of the bookmark category icons 80 was selected. If so, flow moves to block 204 where the priority is set to medium, following which flow moves to block 206 where a second application window is opened displaying the links associated with the selected category. If at block 202 no category was selected, then flow moves to block 208 where a check is made to determine whether a specific bookmark or link was selected by the user. If so, flow moves to block 210 where the priority is set to high, following which the default browser is run and the web page specified by the selected link is accessed. If at block 208 no link was selected by the user, flow drops down to block 214 where a check is made to determine whether the user has entered a URL or other web page address into URL text field 74. If so, flow moves to block 216 where the priority is again set to high following which the default browser is opened and the specified link is accessed, as indicated at block 218. If at block 214 no URL was inputted, then no further action is taken by client software application 10.

Turning now to FIG. 12, the processing of key events represented by block 174 of FIG. 10 will now be described. As indicated at block 220, the first step is to determine the current priority level which, as discussed in connection with FIG. 11 may have been set from the default general priority level to either medium or high. Flow then moves to block 222 where, in the case of the priority being either medium or high, the selected category of information (finance, news, sports, etc.) is determined so that only those banners associated with that category can be selected as candidates for display. Then, at block 224, using the determined category a particular banner is selected and displayed in the banner region 78. As previously discussed, in addition to an associated category, the banners can also be selected based on associated links and/or programs in the event, for example,

20

that the user accesses a website that is listed in the banner database 130. Flow then moves to block 226 where a record is made of the occurrence of the event, the display of the banner, and the time that the event occurred. This computer usage information can now be reported back to ADM server 22 or a reporting flag can be set so that this information can be reported back the next time that the server is accessible. Flow then moves to block 228 where the banner count associated with the displayed banner is incremented by one. Then, at block 230, a check is made to determine whether the current group of banners has expired, based on their banner counts. If not, the key event processing is finished and flow then returns to block 168 of FIG. 10. If the banners have expired, then flow moves to block 232 where the next available set of locally stored banners is utilized for display purposes and the flag alert component 112 is notified so that it can set the new banner flag, as indicated at block 234. Processing then returns to block 168 of FIG. 10.

Referring now to FIG. 13, a first implementation of the builder routine 190 of FIG. 10 will now be described. The process begins at block 236 where the builder component 64 accesses version numbers for each component in the client software application. Flow then moves to block 238 where, using this information, builder component 64 generates a current blueprint. Then, at block 240, the builder component accesses an updated blueprint from ADM server 22. At block 242, a check is made to determine whether the updated blueprint is the same as the current blueprint. If so, the client computer has the upgraded version and no upgrading is necessary, as indicated at block 244. Flow then returns to block 168 of FIG. 10. If, at block 242, the updated blueprint is different from the current blueprint, flow moves to block 246 where the builder module determines which components are new or need upgrading. Flow then moves to block 248 where a check is made to determine whether the builder module itself needs to be upgraded. If not, flow moves to block 250 where the new or upgraded components are downloaded from server 22 and installed. If an upgraded builder module is needed, then flow moves from block 248 to block 252 where control is passed from the builder module to auxiliary module 66, following which flow moves to block 254 where execution of the builder module is terminated so that it may be overwritten with the new builder module. Flow then continues to block 250 where the builder module and other upgraded components are downloaded and installed under control of auxiliary module 66. Flow then returns to block 168 of FIG. 10.

Referring now to FIG. 14, another embodiment of builder routine 190 of FIG. 10 will now be described. In this embodiment, the builder module does not determine the current names and version numbers of all the modules that make up client software application 10, but rather uses a version ID associated with the application to determine whether upgrading of any of the components is necessary. The process starts at block 256 where the builder module accesses an updated blueprint ID from ADM server 22. Then, at block 258, a check is made to determine whether the updated ID is the same as the current version ID. If so, then no upgrading of components is necessary as indicated at block 260 and flow returns to block 168 of FIG. 10. If the ID's are not the same, flow moves to block 262 where the builder module sends the current version ID back to ADM server 22. This current ID is used by ADM server 22 to determine which components need to be downloaded and installed at the client computer so that it has the most recent version. Then, at block 264, the builder module downloads and installs the updated components, following which the

21

process returns to block **168** of FIG. **10**. As with the process of FIG. **13**, auxiliary module **66** can be used in the event of upgrading of builder module **64** itself. As will be appreciated by those skilled in the art, once the new components have been downloaded and installed, whether by the process of FIG. **13** or FIG. **14**, restarting of the computer may be necessary.

It will thus be apparent that there has been provided in accordance with the present invention a method and apparatus for providing an automatically upgradable graphical user interface with targeted advertising which achieves the aims and advantages specified herein. It will of course be understood that the foregoing description is of a preferred exemplary embodiment of the invention and that the invention is not limited to the specific embodiment shown. Various changes and modifications will become apparent to those skilled in the art. For example, although the advertising features described herein have been disclosed in connection with client software application **10**, it will be appreciated that these features can be incorporated into any of a number of other types of software applications and can even be incorporated into the operating system's user interface itself. Other features of client software application **10** can be incorporated into and made an integral part of other software applications and operating systems. Also, rather than downloading the client software application via the Internet or some other network, it could be installed on the user's computer from a CDROM or DVD, with the new user login process of FIG. **9** being used to acquire demographic data on all users of the software. All such variations and modifications are intended to come within the scope of the appended claims.

I claim:

**1.** A computer-readable memory for use by a computer to provide a user of the computer with an automatically-upgradeable software application, comprising:

a non-volatile data storage device;

a program stored on said non-volatile data storage device in a computer-readable format, said program comprising a plurality of program modules;

at least one version identifier associated with one or more of said program modules, said version identifier(s) being stored on said non-volatile storage device;

wherein one of said program modules is operable upon execution to access said stored version identifier(s) and at least one updated version identifier from a server via a global public network, with said updated version identifier(s) representing one or more updated program modules accessible from a server via the public network, wherein said one program module is further operable to download one or more updated program modules when said stored version identifier and said updated version identifier are different, with said updated program module(s) replacing one or more of said program modules stored on said data storage device, and, further, wherein said one program module is operable to store said updated version identifier.

**2.** A computer-readable memory as defined in claim **1**, wherein said one program module is operable when executed by a microprocessor to compare said stored version identifier with said updated version identifier and, if said stored and updated version identifiers are different, to send a download request to a server via the public network.

**3.** A computer-readable memory as defined in claim **1**, wherein at least some of said program modules each have a unique version identifier associated therewith and wherein

22

said one program module is operable to generate a current blueprint of said program modules by accessing each of said unique version identifiers.

**4.** A computer-readable memory as defined in claim **3**, wherein said one program module is operable to receive from the server an updated blueprint containing updated version identifiers and, wherein said one program module is further operable to compare said current and updated blueprints and to download one or more updated program modules if any of the updated version identifiers from the updated blueprint do not match a unique version identifier from the current blueprint.

**5.** A computer-readable memory as defined in claim **3**, wherein said one program module is operable to send the current blueprint to a server via the public network.

**6.** A computer-readable memory as defined in claim **1**, wherein said version identifiers comprise a module identifier and a module version number.

**7.** A computer-readable memory as defined in claim **6**, wherein said one program module has a version identifier associated therewith and wherein said one program module is operable to upgrade itself when its version identifier does not match its associated updated version number.

**8.** A computer-readable memory as defined in claim **7**, wherein said one program module is written in a programming language and has a number of module commands associated therewith, each of said module commands being used by said one program module to invoke one or more instructions in said programming language, wherein said one program module is operable to perform a function in response to receiving one or more of said module commands, whereby additional module commands can be added to said one program module by automatically upgrading said one module command via the public network.

**9.** A computer-readable memory as defined in claim **8**, wherein said one program module is stored in a file and is operable to upgrade itself by passing control to an auxiliary module, terminating its execution, and thereafter being replaced by an updated version downloaded from a server.

**10.** A computer-readable memory as defined in claim **6**, wherein each of said modules comprise a separate computer file and wherein said module identifier includes a filename.

**11.** A method of providing demographically-targeted advertising to a computer user, comprising the steps of:

providing a server that is accessible via a computer network,

permitting a computer user to access said server via said computer network,

acquiring demographic information about the user, said demographic information including information specifically provided by the user in response to a request for said demographic information,

providing the user with download access to computer software that, when run on a computer, displays advertising content, records computer usage information concerning the user's utilization of the computer, and periodically requests additional advertising content,

transferring a copy of said software to the computer in response to a download request by the user,

providing a unique identifier to the computer, wherein said identifier uniquely identifies information sent over said computer network from the computer to said server,

associating said unique identifier with demographic information in a database,

selecting advertising content for transfer to the computer in accordance with the demographic information associated with said unique identifier;

US 6,628,314 B1

23

transferring said advertising content from said server to the computer for display by said program,

periodically acquiring said unique identifier and said computer usage information recorded by said software from the computer via said computer network, and

associating said computer usage information with said demographic information using said unique identifier.

**12**. The method of claim **11**, further comprising the step of periodically selecting and transferring additional advertising content to the computer in response to a request therefor.

**13**. The method of claim **11**, wherein said computer network is a publicly-accessible global computer network.

**14**. The method of claim **11**, wherein said unique identifier identifies said copy of said software from among other copies of said software.

**15**. The method of claim **11**, wherein said providing a unique identifier step further comprises storing a cookie on the computer.

**16**. The method of claim **11**, wherein said providing steps further comprise providing said computer software which, when run on the computer, requires a user login to use said software and associates a different unique identifier with each of a number of valid users of said software.

**17**. The method of claim **11**, wherein said providing steps further comprise providing said computer software which, when run on the computer, requires a user login to use said software and uses the user login to associate one of a number

24

of unique identifiers with the computer usage information recorded by said software.

**18**. The method of claim **11**, wherein said computer usage information includes data regarding information resources accessed by the user over the global computer network.

**19**. The method of claim **11**, wherein said computer usage information includes data regarding software applications run by the user on the computer.

**20**. The method of claim **11**, wherein said acquiring step further comprises requesting said demographic information in response to a request from the user to download said software and receiving said demographic information from the user prior to providing the user with access to said software.

**21**. The method of claim **11**, wherein said step of providing download access further comprises examining said demographic information to determine that said demographic information includes certain required information and, upon determining that said demographic information includes said required information, providing the user with said download access to said software.

**22**. The method of claim **21**, further comprising the step of limiting said required information to demographic information, whereby the user is permitted anonymous download access to said software and the server is provided demographically-relatable computer usage information.

* * * * *